UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTHERN FLORIDA

Case number:
Adversary Proceeding number:

Julian Rodney Rooks Jr.,
Barbara Rooks

Debtors,

COMPLAINT

Julian Rodney Rooks Jr.,
Barbara Rooks

Plaintiffs, *pro se*     JURY TRIAL DEMANDED

vs.

Equinox Capital, licensed by the United
States Small Business Administration,
Equinox Capital Partners LLC,
Equinox, *et al,*
Prairie Capital,
R3 Education Inc., a Florida Corporation,
R3 Education, a Massachusetts
Corporation, Steven Rodger, CEO,
St. Matthews University, Inc., a Florida
Corporation, St. Matthew's University
(Cayman) Ltd., Corp., a Florida Corporation
St. Matthew's University
School of Medicine LLC, a Florida
Corporation, St. Matthews University
Ltd., a Florida Corporation,

FILED

2016 JAN 22 A 11: 45

CLERK
BANKRUPTCY COURT
NORTHERN DISTRICT FL.

St. Matthews University School of
Medicine *et al.,* St. Matthews University *et al.,*
Jerry Thornton Ph D, St. Matthews
University, Vice President,
Renae Sersland M.D., St. Matthews
University, Vice President of University
Services, Jeffrey Sersland M.D., President
and CEO, St. Matthews University,
Roger Crawford Courtney Esq., Special
Council to St. Matthews University,
Member of the Bar of the
Commonwealth of Virginia and of
other states,
Global Education Resources, LTD., a
Virginia Corporation,
Global Health and Education I Law and
Policy, LLC, a Virginia Corporation,
Global Health and Education Inc., a
Virginia Corporation,
Frank O. Appantaku M.D., an Illinois
Physician and SMU Clinical Preceptor,
Advocate Health Care, an Illinois
Corporation,
Michael Harris M.D., a Florida
Physician,
Galen Paul Swartzendruber, M.D., a
Florida Physician,
Gary McCutchen, Ed. D. St. Matthews
University Chancellor,
Gloria Miranda Avila, St. Matthews
University Registrar,
Nancy Adamson, St. Matthews
University Registrar,
Darlene Kathryn Burke. St. Matthews
University, a Florida Certified Public
Accountant
Jennifer Applequist, St. Matthews
University Registrar,
Janice M. Cresos?, St. Matthews
University Registrar,
The State of Florida, Department
of State, Secretary of

State Ken Detzner
The State of Florida, Department
of Education, Comissioner Pam
Stewart,
Student Finance Corporation
United States doing business as
U.S. Department of Education,
United States doing business as
Sallie Mae,
United States doing business as
Navient,
United States doing business as
Wells Fargo ELT SLFA-WA, Inc.,
United States doing business as
Finance Authority of Maine,
United States doing business as
Deutsch Bank ELT SLM Trusts,
United States doing business as
USA Funds,
United States doing business as
JP Morgan Chase, NA,
United States doing business as
Account Control Technology, Inc.
Sallie Mae, Inc., a Florida Corporation,
Sallie Mae Bank
Sallie Mae, dba Navient Solutions
Inc., a Florida Corporation
Kurt Felder, a Sallie Mae Investigator
Key Bank
Key Education Resources
General Revenue Corporation,
Finance Authority of Maine,
St Joseph's College of Maine,
National Enterprise Systems,
United Student Aid Funds, Inc.,
USA Funds Inc.,
USA Group Loan Services,
Allied Interstate LLC,
GC Services Limited Partnership,
Windham Professionals,
Pioneer Credit Recovery, Inc.,
Progressive Financial Services,

Primary Financial Services,
Sunrise Credit Services, Inc.,
Financial Asset Management Systems Inc.,
Rapid Recovery,
Oxford Law, LLC
and other John/Jane Doe's,

                    Defendants,


                    ADVERSARY COMPLAINT FOR:


          **(I)** "SUBSTANTIAL MISREPRESENTATION" UNDER 34 C.F.R. §
668.71(a)(4)(c) (3 COUNTS) **(II)** FRAUDULENT CONCEALMENT (4 COUNTS) **(III)**
FALSE STATEMENT **(IV)** FRAUDULENT INDUCEMENT **(V)** MISLEADING
STATEMENT UNDER 34 C.F.R. §668.71(a)(4)(c) **(VI)** FRAUDULENT
MISSREPRESENTATION **(VII)** USE OF A "PROHIBITED TRANSACTION" UNDER
34 C.F.R. § 682.212 (a)(1) and (2) AS A FRAUDULENT INDUCEMENT **(VIII)**
"UNLAWFUL PAYMENT" UNDER 20 U.S.C. § 1097(c) **(IX)** LENDERS SUBJECT
TO ALL CLAIMS UNDER 34 C.F.R. 682.209- REPAYMENT OF A LOAN(g)(1)(2)(3)
(4) cascade **(X)** MAIL AND WIRE FRAUD UNDER 18 U.S.C. § 1341(- COUNTS)
**(XI)** FORGERY UNDER 20 U.S.C. § 1097(a) (2 COUNTS more) **(XII)** FRAUD IN
THE FACTUM  **(XIII)** BREACH OF CONTRACT (2 COUNTS)  **(XIV)** CRIMINAL
CONSPIRACY BETWEEN SMU AND IT'S "SPECIAL COUNCIL" TO CONCEAL
THE LOSS OF THE PLAINTIFF'S RECORDS  **(XV)** CRIMINAL CONSPIRACY
BETWEEN SMU'S VICE PRESIDENT AND SMU'S REGISTRAR TO CONCEAL
THE LOSS OF THE PLAINTIFF'S RECORDS  **(XVI)** CRIMINAL CONSPIRACY
BETWEEN SMU AND IT'S CLINICAL COORDINATOR TO CONCEAL THE LOSS
OF THE PLAINTIFFS RECORDS  **(XVII)** "FALSE STATEMENTS RELATING TO
HEALTH CARE MATTERS" UNDER 18 U.S.C. § 1035; "DEFINITIONS RELATING
TO FEDERAL HEALTH CARE OFFENSES" UNDER 18 U.S.C. § 24 (2 COUNTS)
**(XVIII)** CRIMINAL CONSPIRACY BETWEEN SMU AND IT'S ACCOUNTANT TO
CONCEAL THE LOSS OF THE PLAINTIFFS RECORDS **(XIX)** SPECIAL
PERMANENT DAMAGE GME (2 COUNTS) **(XX)** SPECIAL PERMANENT
DAMAGE ECFMG  **(XXI)** FAILURE OF SMU TO NOTIFY PLAINTIFFS AS
CLAIMANTS UNDER F.S. 605.0714  **(XXII)** "DESTRUCTION, ALTERCATION OR
FALSIFICATION OF RECORDS IN FEDERAL INVESTIGATIONS AND
BANKRUPTCY" UNDER SECTION 802 OF THE SARBANES-OXLEY ACT (5
COUNTS more, cascade)  **(XXIII)**OBSTRUCTION OF JUSTICE UNDER THE
SARBANES-OXLEY ACT  **(XXIV)** RESTRUCTURING A CORPORATION FOR THE
PURPOSE OF CONCEALING ASSETS BY FRAUDULENT TRANSFER UNDER 18
U.S.C. § 152(7)(8)  **(XXV)** RESTRUCTURING A CORPORATION IN ANTICIPATION

                    4 of 91

OF A CASE UNDER TITLE 11 **(XXVI)** FALSE STATEMENTS MADE TO A "STATE AGENCY" UNDER (Cali report) **(XXVII)** DEMANDS AGAINST THE UNITED STATES UNDER 18 U.S.C. § 1003 (need records for COUNTS) **(XXVIII)** UNLAWFUL GARNISHMENT MADE UNDER COLOR OF LAW **(XXIX)** DEFENDANTS FILED FALSE CLAIMS WITH THE UNITED STATES (2/4 COUNTS,each loan? Each note?) **(XXX)** FAILURE OF A STUDENT LENDER TO EXERCISE "DUE DILIGENCE" IN THE MAKING OF A STUDENT LOAN UNDER 34 C.F.R. § 682.206(b) (57 COUNTS (more)) **(XXXI)** FAILURE OF A STUDENT LOAN SERVICER TO EXERCISE "DUE DILEGENCE" IN THE SERVICING OF STUDENT LOANS UNDER 34 C.F.R § 682.208(a)(c)(1) (5 COUNT S) **(XXXII)** FAILURE OF A STUDENT LOAN SERVICER TO EXERCISE "DUE DILIGENCE" IN THE COLLECTING OF STUDENT LOANS UNDER 34 C.F.R. § 682.509(b) "SPECIAL CONDITIONS FOR FILING A CLAIM" (4 COUNTS (more)) **(XXXIII)** INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY A STUDENT LOAN SERVICER UNDER 18 U.S.C. § 876(d) "MAILING THREATENING COMMUNICATIONS" **(XXXIV)** DISCHARGE OF EDUCATIONAL LOANS UNDER 26 USC 221(d)(1) and (2) and 11 USC 523(a)(8)(B) **(XXXV)** DISCHARGE OF OTHER FEDERALLY INSURED EDUCATION LOANS UNDER 26 U.S.C. § 221(d)(1)(B) **(XXXVI)** DISCHARGE OF FEDERALLY INSURED EDUCATION LOANS IN GENERAL UNDER 34 C.F.R. § 682.513(a)(1)(2) (3)(i) "FACTORS AFFECTING COVERAGE OF A LOAN UNDER THE LOAN GUARANTEE" **(XXXVII)** VIOLATIONS OF THE PERMANENT ORDER OF THE COURT (cascade COUNTS) **(XXXVIII)** FAILURE TO COMPLY WITH THE STATUTORY REQUIREMENTS OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) **(XXXIX)** FAILURE TO COMPLY WITH THE STATUTORY REQUIREMENTS OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT (FCCPA) (- COUNTS cascade) **(XL)** CONFLICT OF INTEREST **(XLI)** AND FOR EQUITABLE, COMPENSATORY AND DECLARATORY RELIEF.

The complaint of Plaintiff's, JULIAN RODNEY ROOKS JR. ("I, me, my") and

Barbara Rooks ("my Mother"), and collectively " Plaintiffs", respectfully alleges:

### Jurisdiction and Venue

This adversary proceeding is brought pursuant to 11 U.S.C.§ 523 (a)(8), and ….

Plaintiffs file this complaint pursuant to the Federal Rules of Bankruptcy

Procedure Rule 7001(1)(6) and (7), and files this proceeding for declaratory judgment

pursuant to the provisions of The Federal Rules of Bankruptcy Procedure Rule 7001(9).

This is a core proceeding over which this court has jurisdiction under Title 28

U.S.C. § 157(b). This court has "original and exclusive jurisdiction" pursuant to Title 28

U.S.C. § 1334 (a) in regards to Plaintiff Barbara Rooks' related but closed Chapter 7

petition, Case No. 08-40810-LMK, filed before this Court in 2008.

(1) This Court has jurisdiction.

(2) The venue is appropriate.

### Plaintiffs

My parents and I borrowed about $160,000 (now about $260,000) to attend
medical school.

I successfully completed medical school at St. Matthews University School of
Medicine (SMU) in June, 2002. I was never the subject of any disciplinary action and I
passed all courses on the first attempt with a passing score, many with high passes
(exhibits 125, 126A, 128A, 129A, 130A ) and some with honors (exhibits 122C, 124A,
127A,). I was a good student.

### General Background of the Fraud.

SMU lost my medical school records in June of 2001 when I was a
medical student but didn't tell me that it lost the records (State of California report
exhibits 187A,B).

SMU engaged in multiple affirmative acts of fraudulent concealment in a decade-
long conspiracy designed to deceive, silence, stonewall, confuse and conceal that the
Plaintiffs had a cause of action. This conspiracy involved; SMU's Attorney, Vice
President, Registrar, Chancellor, Clinical Coordinator, Accountant and Florida
Registered Agent, and others.

My Parents and I tried to pay these loans for years and SMU directly without
knowing that SMU had lost the records. When my parents and I could no longer keep up
the payments, we suffered unlawful garnishment, thousands of harassing and threatening

calls, my Father suffered a heart attack and died after receiving specific threats made in the name of the United States Department of Education (exhibits 201, 202, video exhibit #11), an investigation by Sallie Mae (exhibit 214D) when Sallie Mae had actual knowledge that these were not qualified education loans (exhibits 142,148) and my Mother's Chapter 7 bankruptcy case (exhibits 215,216,217).

Sallie Mae, Wells Fargo, SMU and others, wrongfully took a lot of money from the Plaintiff's and from my Father over the years and we were pushed into bankruptcy and poverty.

When these loans defaulted, the Guarantor said that my credit was "damaged" (exhibit 235-1A) and to prepare for "drastic collection efforts" (exhibit 235-1C).

My Mother, wife, and family could not survive a second wave and we were pushed further into poverty and bankruptcy. My mother and I were sent pictures of dumbbells (exhibits 224, 227), endured a fake lawsuit (exhibit 256), frequent violations of the Permanent Order of this Court from her Bankruptcy case (exhibits 215-229), poverty requiring food stamps for adequate nutrition, a credit score of "3" (exhibit 276D,E), this Bankruptcy case and over a thousand additional threatening and harassing phone calls many times a day, almost every day for many years (exhibits 250-255) of such frequency and content that my wife immigrated to a foreign country (exhibit 292).

The Guarantors then filed False Claims with the United States (associated core proceeding) and they were wrongly reimbursed from funds of the United States. This is the proof that both Sallie Mae, the Lenders and the Guarantors had actual knowledge that these were not qualified education loans for many years before they filed claims stating that the loans were (exhibits 139, 142-150).

SMU offered other students secret settlement agreements but not the Plaintiff's. The Plaintiff's were unique and different because my family and I were and are residents of the State of Florida (exhibit 66), SMU's "primary place of business". The true purpose of this Florida application and Florida license (exhibits 167-175) was in it's misuse of the law as a legal trick to restructure SMU to avoid responsibility for, and payment of, Plaintiffs valid claim for damages which existed in 2001 but was only recently discovered due to the fact concealed. Plaintiffs believe this application and the resulting license restructuring SMU, represents a fraudulent transfer as set forth under 11 U.S.C. § 548(e) (2)(b) made in contemplation of a case under Title 11 and with intent to defeat the provisions of Title 11. This Florida Department of State document is a fraud (exhibit170, 176-179, video exhibit #7), wrapped inside a larger fraud (exhibits 167-175).

This case has ripened and is now fully ripe.

From the beginning, SMU's Vice President lied to me (exhibits 61,62). He told me

that SMU had US Government loans when he had actual knowledge that this was not true. SMU gave me student loans insured and provided by the US Government under 20 U.S.C. § 1070 et seq., (exhibits 143, 146) when SMU was not an "eligible education institution" under 26 U.S.C. 221(d)(1) and (2). In the black and white letters of these emails, SMU's Vice president, Jerry Thornton, directs me to pay tuition to his ineligible institution using these funds (exhibit 61,62) along with a significant inducement to do so (exhibit 61N).

SMU's loss of my medical school records in June of 2001 transformed these misrepresented title IV loans (exhibits 143, 146) into toxic ticking time bombs set to go off as false claims cases many years later. In 2014, 14 years later, I received a request from Sallie Mae and the Lenders to sign a new "Promissory Note" for only the US government loans from SMU (exhibit 271E,A,B,C) within 7 days and when I failed to do so they sent a notice that they would "suspend our previous request to intercept" (exhibit 274D) citing only vague "circumstances that resulted in this suspension of offset" (exhibit 274G);

but the damage is already done.

Mr. Courtney's toxic ticking time bombs have begun to go off (exhibit 286C).

These same individuals in this case are currently seeking Florida approval again (video exhibits #14, #15, #16, #17) and access again to the Federal Student Loan's they once misrepresented (exhibits 61,62) and misused and have already gained access to some Federal Student Loans (exhibit 268).

*Id est,*

The tort of concealing of the loss of the records (exhibit 1, TORT A) and thus the Plaintiff's cause of action, flows from the negligent loss of the records (exhibit 1, NEGLIGENCE A) and "TORT A" is the direct and proximate cause of the Plaintiffs special damages and grief.

SMU aggravated and broadened the scope of the damage when it deleted these additional academic records (exhibits 133C, 248C,D). The purpose of deleting the records was to conceal that SMU had a duty to keep the records and to conceal that SMU did provide the records and that the records SMU provided here (exhibits 133, 134) were fabricated to replace the records it lost here (exhibits 99A,B, 187A,B).

While SMU's role in offering the loans and concealing the loss of the records was a substantial factor, the tort of filing False Claims is significant (exhibit 1, TORT B) because it flows from Sallie Mae and the Lenders negligent failure to perform the

lawfully required due diligence in the making, servicing and collecting of the loans (exhibit 1, NEGLIGENCE B), failure to take reasonable care, and Sallie Mae's and other defendants multi-year failure to follow the permanent injunction of this court (exhibits 218-229). Plaintiffs believe that this conduct "NEGLIGENCE B, TORT B" is a concurrent cause of the Plaintiffs' damages and grief.

Now comes the Plaintiffs, in this action for relief and to safeguard the health of his surviving parent and dependent child in the forum of competent jurisdiction, venue and authority to address the scope of the allegations of this issue and to grant the specific relief requested.

## Defendants

1.      St. Matthew's University School of Medicine ("SMU") claims to be "licensed" and "approved in" "Florida" (exhibit 2, A and B).

2.      "St. Matthews University, Inc." is a Florida corporation (exhibit 3).

3.      "St. Matthews University (Cayman) Ltd., Corp." is a Florida corporation (exhibit 4).

4.      For four months in 2011, the name "St. Matthews University" was a "doing business as" (dba) name licensed by the Florida Department of Business and Professional Regulation (exhibit 5). The "primary name" of the Licensee was "Bedard Kurowicki & Co CPA's PC", a firm licensed by the State of New Jersey's Department of Law & Public Safety (exhibit 6).

5.      Defendant Dr. Michael Harris, M.D., is listed as the "Registered Agent" and as the "Officer and Director" on these State of Florida documents (exhibits 39 A,B, 47A, 48A, 49A,B, 174 A,C).

6.      In 1998, SMU sent this catalog to me in Florida (exhibits 53-60) from Liberty Lake in the State of Washington where SMU was also registered as a corporation (exhibit 38A,B).

7.      In this SMU catalog (exhibit 53-60) Dr. Michael Harris is listed as "President and CEO, St. Matthews University" (exhibit 60A). The address on Dr. Harris' Florida medical license (exhibit 44) is the same Florida address listed on my SMU invoices (exhibits 160J, 161G, 162G).

8.      Defendant Dr. Galen Swartzendruber M.D. is listed as an SMU "Director" on this State of Florida document (exhibit 47E), and subsequent others (exhibits 48B, 49C, 174B) but fails to appear on this document (exhibit 39). Dr. Swartzendruber is listed in my SMU catalog (exhibit 53-60) under "St. Matthew's Faculty" (exhibit 60B). Exhibit 43 is Dr. Swartzendruber's Florida medical license.

9.      Defendant Dr. Jerry Thornton is listed in SMU's catalog (exhibit 53-60) as "Vice President and C.O.O., St. Matthews University" (exhibit 60C). Page 4 of this catalog (exhibit 54) is a letter signed by Dr. Thornton with his picture on it with the title "Vice President, Director of Clinical Sciences". Dr. Thornton is listed as an "Officer and

Director" on this State of Florida document (exhibit 47D) and on this State of Florida SMU Cayman application (exhibit 174D). These emails faxes and documents are with Dr. Jerry Thornton (exhibits 61,62, 103-107).

10.     Defendant Dr. Jeffrey Sersland M.D. is listed as an "Officer and Director" on this State of Florida document (exhibit 47 B).

11.     Dr. Renae Sersland M.D., herself, wrote this, in her own handwriting; "Vice President of Univ. Serv. And Dir. Of Fin Aid" (exhibit 84I). Dr. Jeffery Sersland M.D. and Dr. Renae Sersland M.D., are collectively "the Serslands'".

12.     Rodger Courtney is an attorney, licensed to practice law in the State of Virginia (exhibit 7). In his resume (exhibits 283-290), Rodger Courtney states "Special Counsel...St. Matthews University School of Medicine....May 1998-May 2001" (exhibit 286 A) and " President & CEO... Global Education Resources, Ltd... January 1998-December 2011" (GER)(exhibit 285A). The web address and domain path of this profile is memorialized as video exhibit #13. GER's name recently changed to "Global Health and Education I Law and Policy, LLC" (exhibit 283A). GER was incorporated in the State of Virginia, Roger Courtney was listed as "Pres/CEO" (exhibit 8). Mr Courtney's newly renamed company is registered in Virginia (exhibits 9,10). Mr. Courtney faxed this GER document to me in Tallahassee, Florida (exhibit 87B), and these telephone calls are with Mr. Courtney (exhibits 100A, 101A).

13.     This article published by Bloomberg states "...St. Matthew's are owned by private equity firm **Equinox Capital**, through its R3 Education Inc. Steven Rodger, founder and managing partner of Greenwich, Connecticut-based Equinox,..." (exhibit 11).

14.     Defendant Prairie Capital itself states that it "partnered with Equinox Capital to acquire the three Universities" (exhibit 19C) and further states "Contact Steve King or Bryan Daniels for more information" (exhibit 19C). Equinox Capital's website claims "Equinox Capital is licensed as a Small Business Investment Company by the United States Small Business Administration" (exhibit 12). Equinox Capital's website shows "St. Matthews University" under the tab "select transactions" and provides a hyperlink to SMU's website (exhibit 13). Steven Rodger is listed on Equinox's website as "Founder" and "responsible for the firm's" "oversight and administration" (exhibit 14). Steven Rodger is listed as "P" for St. Matthews University, Inc., (exhibit 3B) and for St. Matthews University (Cayman) Ltd., Corp. (exhibit 4B). R3 Education, Inc., is a Florida Corporation (exhibit 15A) with Steven Rodger listed as "PD" (exhibit 15B) at SMU's Florida address. R3 Education is registered as a "Foreign Corporation" in the commonwealth of Massachusetts, organized under the laws of the State of Delaware (exhibit 16A). Steven Rodger is listed as the "CEO" of R3 Education (exhibit 16B) and as a "Director" of R3 Education (exhibit 16C). Daniels and King Management LP, is licensed to do business as Prairie Capital (exhibit 17-2) by the State of Illinois, Department of Business Affairs and Consumer Protection (exhibit 17-1 A,B), Illinois Lic # 1892657 (exhibit 17-1C). Bryan Daniels and Stephen King are listed as "D" on this R3 Education Inc., State of Florida document (exhibit 15 C, D) and Massachusetts document

exhibit 16 D, E. Prairie Capital lists R3 education under it's "Prairie Capital IV Fund" (exhibit  19A) and SMU under it's "Prairie Capital Fund III" (exhibit  19B).

15.      Dr. Frank Olusegun Apantaku M.D., is listed in SMU's catalog on page thirty-one under "Clinical Faculty and Preceptors" (exhibit 20). Defendant Dr. Frank Apantaku is a physician liscensed to practice medicine in the State of Illinois (exhibit 18). These images, of other medical students, were taken by me in Dr. Apantaku's office at St. Mary's Advocate Hospital in Chicago, Illinois (exhibits 92,93).

16.      Gloria Miranda Avila was SMU's Registrar in 2001 (exhibit 97D, 103A,B), and, after about a decade away, is now SMU's Registrar again (exhibit 24). Gloria wrote and signed this personal note to me (exhibit 103B).

17.      Darlene Burke is a Certified Public Accountant, licensened by the State of Florida (exhibit 21). Ms. Burke faxed these exhibits to me as SMU's accountant (exhibits 152-155, 157-162). Her name appears on these State of Florida documents (exhibits 171, 172H).

18.      Dr. Gary McCutcheon is listed as SMU's "Dean of Clinical Students" and SMU's "Executive Director of Clinical Operations" (exhibit 23). In this profile, Gary McCutcheon claims his dates of employment with SMU as "August 2005-March 2010" (exhibit 23B). Gary McCutcheon gave me this card in a face-to-face meeting in his office at SMU's office in Orlando, Florida (exhibit 206).

19.      Nancy Adamson is an SMU Registrar. Her signature appears on these transcripts (exhibits 132, 134).

20.      Jennifer Applequist is an SMU Registrar. Her signature appears on this transcript (exhibit 246). These email exhibits are between her and I (exhibits 230-235).

21.      Janice Cresos (illegible???) is an SMU registrar whose name appears on this SMU seal (exhibit 245).

22.      Defendant Kurt Felder is an "Investigator" employed by Sallie Mae (exhibit 214D).

Sallie Mae is a Florida Corporation (exhibit 85-5).

Sallie Mae is a Florida Corporation operating under the fictitious name Navient Solutions, Inc. (exhibit 24-1).

Wells Fargo is a Florida corporation.
United Student Aid Funds Inc. is a Florida corporation.
General Revenue Corporation is a Florida corporation.
National Enterprise Systems is a Florida corporation.
Allied Interstate is a Florida corporation.
Financial Asset Management Systems is a Florida corporation.
Windham Professionals is a Florida corporation.
Progressive Financial Services Inc.is a Florida corporation.
GC Services Limited Partnership is a Florida corporation.

11 of 91

JP Morgan Chase & Co.is a Florida corporation.
Pioneer Credit Recovery is a Florida corporation.
Deutsch Bank is a Florida corporation.
Oxford Law LLC is a Florida corporation.

The following defendants are the "Current Servicer" for Plaintiff's student loans:

     SALLIE MAE, INC.
     220 LASLEY AVE.
     WILKES-BARRE
     PA 18706
     888-272-5543

The following defendants are the "Current Lender" for Plaintiff's student loans:

     WELLS FARGO ELT SLFA-WA, INC.
     625 MARQUETTE AVE., MAC N9311-115
     MINNEAPOLIS
     MN 554790000

     DEUTSCH BANK ELT SLM TRUSTS
     11600 SALLIE MAE DR,DEB SOUTHERLAND
     RESTON
     VA 201930000
     888-272-5543

     JP MORGAN CHASE BANK, NA
     C/O SALLIE MAE
     P.O. BOX 59012
     PANAMA CITY
     FL 32412
     888-272-5543

     SLM EDUCATION FINANCE CREDIT CORP.
     2001 EDMUND HALLEY DR.
     RESTON
     VA 201910000

The following defendants are the "Current Guarantee Agency" for Plaintiff's student loans:

     FINANCE AUTHORITY OF MAINE (FAME)
     P.O. BOX 6180
     INDIANAPOLIS

IN 462066180
888-272-5543

USA FUNDS, INC.
P.O. BOX 6180
INDIANAPOLIS
IN 462066180

### FACTUAL ALLEGATIONS

1.      On or about June 23, 1992, a patient (patient 1) expired (exhibit 26).

2.      On March 20, 1994, The State of Florida filed an Administrative Complaint naming Dr. Galen Paul Swartzendruber, M.D.,  as the Respondent (exhibits 25-27). The nature of the charge is described in the bracketed area (exhibit 27). A Consent Agreement was signed by Dr. Swartzendruber on September 1, 1994 (exhibit 32). Among other requirements,  Dr. Swartzendruber was required to attend "continuing medical education", "in addition to those hours required for renewal of licensure" in a "live lecture format" (exhibit 30).

3.      The Final Order was filed on October 11, 1994.  The case number on this Final Order was not correctly styled. The correct case number is 92-15612, not 91-15612 (exhibit 34).

4.      Dr. Swartzendruber bore a grudge against the State of Florida and he began a campaign of concealment, misrepresentation and unlawful conduct designed to mislead the State of Florida, the United States and the Plaintiffs for the purpose of wrongfully and unjustly enriching himself.

5.      On August 5, 1997 (exhibit 36A), and on September 12, 1997 (exhibit 38A), Defendant Dr. Galen Paul Swartzendruber M.D. registered his medical school in the States of Florida and Washington respectively.

6.      On SMU's 1998 Florida Annual Corporation Report (exhibit 39) someone switched Dr. Swartzendruber's name with Dr. Michael Harris's name.

7.      The web path and domain address of this document has been memorialized as video exhibit #2.

8.      The barcode has been redacted (exhibit 39D) (see exhibit 47 I).

9.      A handwritten number has been issued (exhibit 39G).

10.     The corner of a small piece of white paper typed to look like the original file date has been laid over the original file date and the redacted bar code (exhibit 39E).

11.     Space 3 was left blank (exhibit 39F) when the school had been in

existence since these dates (exhibits 36A, exhibit 38A).

    12.    Dr. Michael Harris misspelled the name of his own medical school (exhibit 39C), " St. Matthew", " School of Medicine").

    13.    SMU was titled and spelled differently the previous year here (exhibit 36B) and here (exhibit 38B).

    14.    Eight months later, in January, 1999 the State of Florida's Department of Education granted this license to SMU (Lic. # 2634)(exhibit 40A).

    15.    Dr. Swartzendruber acted to deceive by holding out Dr. Michael Harris as the sole nominal "Officer and Director" of SMU (exhibit 39A,B) when Dr. Swartzendruber was the Real Party in Interest.

    16.    Dr. Swartzendruber acted to deceive because:

        a.    Dr. Swartzendruber had a prior "Criminal Offense" (exhibit 41), and because;

        b.    the State of Florida had previously charged that Dr. Swartzendruber had "violatied Section 458.311(l)(t), Florida Statutes, gross or repeated malpractice or the failure to practice with that level of care, skill, and treatment which is recognized by a reasonably prudent similar physician as being acceptable under similar conditions and circumstances" (exhibit 27) in the wrongful death of this 41 year old patient (exhibit 26).

    17.    Four months after this license was granted by the Florida Department of Education (exhibit 40A), Dr. Swartzendruber's name appears on SMU's 1999 Corporate Report (exhibit 47E) and on all subsequent SMU Florida Corporation filings (exhibits 48B, 49C) including this SMU Florida application for a license as a Florida Foreign Corporation dated 2004 (exhibit 174B).

    18.    This 2005 report by the State of California's Division of Licensing list Dr. Swartzendruber as the sole investor of SMU (exhibit 188B).

    19.    In late 1998, I was looking for a medical school that had US government student loans. SMU's Vice President Dr. Jerry Thornton told me that SMU had US Government student loans. I remember his words because I was surprised to be put on the phone with the school's Vice President.

    20.    SMU is not, and was not at the time an "eligible education institution" under 26 USC 221(d)(1) and (2).

### "Substantial misrepresentation" under 34 C.F.R. § 668.71(c).

    21.    Dr. Thornton knowingly made a "substantial misrepresentation" as defined under 34 C.F.R. § 668.71(a)(4)(c) when he substantially misrepresented the eligibility of his school (SMU) to receive these Title IV HEA funds.

    22.    Dr. Thornton told me that he had been a member of the American

University of the Caribbean School of Medicine (AUC) faculty when I attended AUC as a medical student and that he was on the cover of the student catalog. I looked at my AUC catalog and he was on the cover (exhibit 50). Dr Thornton asked a series of several questions which only an AUC student would know the answer to. We discussed events, at length, that had occurred at AUC, and traded stories about the volcano that had erupted and destroyed AUC (exhibit 51, 52). I felt that Dr. Thornton was a kind, even meek individual (see his affect and mannerisms in video exhibit #14) with whom I shared common ground and that Dr. Thornton's numerous questions demonstrated his genuine interest in me as a medical student.

     23.     Dr. Thornton told me that licensure and accepted of SMU by the State of Florida was imminent.

     24.     Dr. Thornton offered to send a catalog and, based upon Dr. Thornton's statements and our conversation, I accepted and SMU sent this catalog to me in Tallahassee, Florida (exhibits 53-60), along with this letter with SMU's "Vice President" Dr. Thornton's picture and signature on it (exhibit 54).

     25.     This catalog (exhibit 53) has 30 pages.

### Fraudulent Concealment

     26.     Not one single word in this catalog mentions St. Joseph's College of Maine (SJC) or any "cost-sharing" tuition program. SMU's failure to disclose the involvement of that second institution (SJC) anywhere in this catalog creates the illusion of it's nonexistence.

### False Statement

     27.     Page 11 states "Tuition at St. Matthew's is $6,400 per semester." (exhibit 55).

     28.     This is a false statement.

     29.     In this email, Dr. Thornton himself reveals the true SMU tuition cost per semester as "SMU note till graduation*- 2,400" (exhibit 61E) and "Balance owed SMU $3,250" (exhibit 61K). I believe that $2,400 plus $3,250 equals $5,650, not $6,400. I believe $5,650 was the true cost, per semester, of SMU tuition, not $6,400 as stated.

### Fraudulent Concealment

     27.     I believe that $5,650 plus $750 equals $6,400. SMU's catalog fails to disclose that $750 is for tuition at another institution (SJC, exhibit 61M) and this omission was designed to conceal the involvement of that second institution (SJC).

     28.     I believe this manner of concealment to be fraudulent.

     29.     SMU's attorney, Rodger Courtney, states in his resume that he was SMU's "Special Counsel" from "May 1998-May 2001" (exhibit 286A).

     30.     Mr. Courtney's resume also states " Performed primary role in establishing the administration of financial aid and marketing." (exhibit 286C).

31.    I believe Mr. Courtney performed a primary role in establishing this financial aid scheme (exhibits 61,62, 143, 146) and this marketing catalog (exhibit 53).

32.    I applied to SMU, the Florida State University (FSU) sent official transcripts, and I was accepted.

33.    A few days before leaving for SMU, Dr. Thornton told me how important it was to sign up for a graduate program offered by St. Joseph's College of Maine. I had no interest in such a program but Dr. Thornton said that this was how to pay tuition to SMU (email exhibit 62B, "Back in January we spoke about paying my tuition upon arrival of Stafford" ), (hereinafter exhibits 61 and 62, "the contract").

34.    Dr. Thornton offered to allow me to attend SMU at a discount with that discount deferred "till graduation" (exhibit 62B, 61C, 61E). I felt it was an offer I could not refuse and I applied to St. Joseph's College of Maine's graduate program and FSU sent official transcripts to SJC about a month after it sent official transcripts to SMU.

### Fraudulent Inducement

35.    Dr. Thornton's offer to "hold a note on you for $2,400 per semester" (exhibit 61C) was an act of fraudulent inducement because it was Dr. Thornton's intent to obtain funds from the United States by inducing the Plaintiff to act in order to perfect his fraud.

36.    I accepted Dr. Thornton's offer and moved from Tallahassee, Florida to the country of Belize on or about January 12, 1999.

### SPRING SEMESTER 1999 AT SMU

37.    On Wednesday, March 10, 1999, at 7:13 am, I emailed SMU's Vice President, Dr. Jerry Thornton (exhibit  62A). I notified him of the arrival of a Stafford loan. I identified this loan to him as a Stafford Loan (exhibit 62C). I asked Dr. Thornton to reaffirm how much I should pay in "tuition" to SMU from this Stafford loan (exhibit 62D). About three hours later, at 10:30 am (exhibit  61A), Dr. Thornton reaffirmed our oral contract and memorialized this agreement as a written contract (exhibits 61 and 62, "the contract") and directs me to use this Stafford loan to pay tuition to SMU (exhibit 61). The next day, March 11, 1999, at 12:40 pm, Dr. Thornton reaffirmed the contract again in a separate email (exhibit 61J), and later that same day, March 11, 1999, I paid SMU $3,250 for tuition (exhibit 63) from this Stafford loan (exhibit 143) and SMU cashed the check. When the next US Government Stafford loan arrived (exhibit 146), I paid SMU $3,250 for tuition again and SMU cashed that check also (exhibit 64). I printed out and saved these emails so that I would know how much to write the checks for, " I cannot remember the exact amount of tuition we agreed to defer" (exhibit 62D).

38.    SMU's Vice President, Dr. Jerry Thornton, lied to me from the beginning

(exhibit 61,62, paragraph #19).

39.     SMU is not, and was not at the time an "eligible education institution" under 26 USC 221(d)(1) and (2). The fact that these student loans were not to "an eligible education institution" under 26 USC 221(d)(1) and (2) means that they are not "qualified education loan(s)" under 11 USC 523(a)(8)(B) and therefore are dischargeable as alleged in cause of action #49.

### Use of a "prohibited transaction" under 34 C.F.R. § 682.212(a)(1) and (2), as an "incentive".

40.     Dr. Thornton's "incentive" (exhibit 61N) was a "prohibited transaction" under 34 C.F.R. § 682.212(a)(1) and (2), and this "incentive" is also an "unlawful payment" under 20 U.S.C. § 1097(c) as alleged in cause of action #'s 10,11.

### SUMMER SEMESTER 1999 AT SMU

41.     SMU required that all students attend a mandatory student meeting for what SMU said was "an important announcement". Approximately 100 medical students attended. At this meeting, Dr. Thornton announced to the students that SMU had been "approved by the State of Florida's Department of Education" (exhibit 40). His announcement was met with cheers and extended applause. Dr. Thornton's statement about imminent licensure by the State of Florida had come true (#23). The State of Florida's granting of this license to SMU amplified and reinforced Dr. Thornton's false statements and gave my family and I great false confidence in SMU and in what SMU was doing.

42.     When the State of Florida issued this license (exhibit 40) # 2634 to SMU, SMU was actively engaged in this scheme to misrepresent US title IV loans to the Plaintiffs (exhibits 53-60, 61,62), who were and are residents of the State of Florida.

43.     My class elected 2 representatives (exhibit 65A,B) who assembled this list of the 22 students in my class (exhibit 66).

44.     I am the only student listed from the State of Florida (exhibit 66).

45.     This notice dated 7-12-1999, states that there will be a "Kaplan" (exhibit 67B) board review course "mandated" for the next semester, in the Fall 1999 (exhibit 67A). This is a typographical error. It should read "5th semester students", not "4th semester students" (exhibit 67C).

### FALL SEMESTER 1999 AT SMU

46.     The last half of the Fall semester 1999 at SMU was different from the previous semesters.

47.     I noticed a scorpion in class (video exhibit #3), (exhibits 68,69).

48.     When student representatives asked for water, SMU removed the water dispenser. When student representatives asked SMU to return the water dispenser, SMU returned the dispenser but not the water in it (video exhibit #4), (exhibit 70). The student representative in the video, Annette Olin, is a physician in Rockford, Illinois (exhibit 71).

49.     When student representatives asked for air conditioning, SMU installed a window unit in a wall by the front door and refused to allow it to be turned on (video exhibit #5) (exhibit 72). The student representative in the video, Saleem Koureshi, is a physician in Oklahoma (exhibit 73).

50.     SMU's teachers stopped teaching. One professor, Dr. DiPatre, announced to my class and said "I am refusing to teach any further because I have not been paid in 4 months" (exhibit 74). Dr. DiPatre is a physician in Galveston, Texas (exhibit 75).

51.     The Kaplan medical board review course referred to in this notice (exhibit 67) was at the end of the semester and lasted about 4 weeks. Students were required to watch inaudible, blurry amateur videotapes of a lecturer speaking and given a stack of books pirated by SMU (exhibit 76). There were a few "Live Lecturers" but they did not teach the evidence based science taught by SMU's other instructors. The First "Live Lecturer" tried to convince me that I could effectively treat patients using an invisible "force field" which he claimed was generated by sodium and emanated from trees and other large shrubbery. The second "Live Lecturer" asked my class to refer to her as a "Shaman" and told the class that we could cure multiple medical pathologies using hand-held crystals composed of some transparent substance.

52.     The class held a meeting about this approximately 3 weeks before the class was to leave the Island and Belize. The class representatives (exhibit 65A,B) said the quality and nature of this Kaplan board review course (exhibits 67, 77, 78) was such because SMU's administration was unhappy with the class having elected representatives and for those representatives requests for water, pest control, a student copier and air conditioning.

53.     The catalog states that the class is suppose to elect representatives (exhibit 59).

54.     This memo from the Academic Dean, Dr. Pynn, states "the lectures are part of the review course" (exhibit 77A) and describes these individuals as "distinguished lecturers" (exhibit 77B).

55.     On or about 11-10-1999, Kaplan sent this letter to my parents Tallahassee, Florida address, not my SMU address, thanking me for paying $2,800 for this Kaplan board review course. This fee, ($2,800) for this Kaplan board review course (exhibits 78) was deducted from this Sallie Mae (SLM) loan (exhibit 84).

56.     I was charged an additional, separate fee by SMU for these three pirated books (exhibit 76) and this charge (invoice, exhibit 79) was deducted from this same SLM loan (exhibit 84).

57.     This SMU employee (exhibit 81), and others, printed up full copies of

these books (exhibit 76) and countless others throughout 1999 using several high-speed copiers and book binding machines, violating the providence of the copyright holders on a massive, industrial scale. These copied books omitted the page with the copyright information but late in 1999 when SMU began copying 2 book pages onto 1 copied page this properly registered Federal copyright information was included (exhibit 80A). I was charged for these other books as well, throughout 1999, and these charges were deducted from these title IV Stafford loans (exhibits 143, 146) and funds provided and insured under 20 U.S.C. § 1070 et seq. directly financed the violation of 17 U.S.C § 501 et seq..

58.    I did not want, make, request or need these copied books that I was charged for. There was a copy machine for students at SMU but it did not work (video exhibit #6)(exhibit 82).

59.    I do not believe that any of these charges (exhibits 78, 79, para. #57) were "qualified higher education expenses" within the meaning of 26 U.S.C. § 221(d)(2).

60.    In the last few days of the Fall semester, this letter from SMU's CFO was in my SMU mailbox (exhibit 83). It says "If payment is not received immediately, you will be suspended" (exhibit 83A). This statement "This is your third and final notice" is not true (exhibit 83B). This statement "To obtain an appointment" is not true (exhibit 83C), this appointment had already been scheduled for me (exhibit 83D).

61.    At this meeting, Dr. Renae Sersland told me that I owed SMU $10,240 (exhibit 84B). I told her about Dr. Thornton's email ("the contract" exhibits 61, 62), deferring a portion of tuition "till graduation" and Dr. Thornton's statement "*I forwarded a copy of this to Dr. Renae Sersland*" (exhibit 61B). Dr. Renae Sersland said that Dr. Thornton cannot make that offer. Dr. Renae Sersland said she would give me until January 15, 2000 to get the money and she wrote this in her own handwriting (exhibit 83E).

62.    Dr. Renae Sersland said that I would be immediately suspended if I did not sign her written statement.

63.    Dr. Renae Sersland gave me this SLM Sallie Mae loan application at this meeting (exhibit 84). Dr. Renae Sersland filled out the bottom of the application. She wrote, in her own handwriting, "$6,400" in the box marked "Tuition Amount" (exhibit 84D), even though Dr. Thornton states in the contract that tuition would be "$3,250" (exhibit 61K). I noticed later that when Dr. Renae Sersland left to make my copy of exhibit 84, someone added the word "Kaplan" and underlined it (exhibit 83F), even though Kaplan was not discussed in this meeting and it was not there when she left to make the copy.

64.    SMU's "Director of Financial Aid", Dr. Renae Sersland, herself, and in her own handwriting, fraudulently misrepresented that this SLM loan was for "Classes" the following semester (exhibit 84F,G) when, in fact, she had actual knowledge that the purpose of the loan was not for "Classes" but rather to repay SMU's false and wrongful claim of a debt of $10,240 from 1999, claimed by SMU in violation of the contract (exhibits 61,62). Because Dr. Sersland was aware that this loan was not for "Classes"

when she wrote in these dates for "Classes", for spring 2000 (exhibit 84F,G), Plaintiffs believe this to be a case of fraud in the factum.

65.    One of my classmates came out of Dr. Renae Srslands's office as I went in, and another classmate came in as I went out. This scheme may have involved my entire class or even the entire school.

66.    I believe there was an investigation by the State of New Jersey's Department of Law and Public Safety involving this SLM loan in 2011 (exhibits 5,6). The following document are between Plaintiffs in Tallahassee, Florida and SLM in Marlton, New Jersey (exhibits 84H, 85C, 85-(1)G, 85-(2)B, 85-(3), 85-(4)E.

### RETURN TO TALLAHASSEE FLORIDA

67.    I asked my Mother, Plaintiff Barbara Rooks (living) and my Father (Julian Rodney Rooks Sr., deceased) for their financial help and they signed for this SLM loan in Tallahassee, Florida (exhibit 84).

68.    These instructions for the school were stapled to the application and given to me (exhibit 85A, "prior to giving the application to the student"). It says "money is transferred to school within 72 hours" (exhibit 85B).

69.    We received this from SLM on or about 12-17-1999 (exhibit 85-(1)A).

70.    These documents were sent to SLM in Marlton, New Jersey (exhibit 85-(2)A).

71.    SLM responded on or about 12-29-1999 (exhibit 85-(3), 85-(4).

72.    SLM is a Florida Corporation listing these Marlton, New Jersey addresses (exhibit 85-5).

SLM changes the loan number from #14877 (exhibit 85-(4)D, to 9654347950-1 (exhibit 219A).    -----find out when/why it changed RECORDS-----

Plaintiffs motion for the production of all records regarding Plaintiffs from SLM.

72.    In late 1999 or early 2000, I told SMU what Dr. Renae Sersland had said during my meeting with her on November 29, 1999. SMU gave me this phone number, (407-221-7530), said it was Dr. Thornton's cell phone and told me to call him.

68.    Dr. Thornton answered it. Dr. Thornton said that Dr. Renae Sersland could not do what she had done and that SMU would honor it's agreement.

69.     Dr. Thornton told me that SMU's attorney would personally assist me in obtaining student loans. Dr. Thornton said his name was Rodger Courtney. Dr. Thornton gave me Mr. Courtney's number and told me to call him.

70.     Knowing that an attorney, licensed to practice law, would personally assist me in obtaining student loans gave me great confidence.

71.     I called Mr. Courtney. Mr. Courtney told me that he was SMU's attorney.

72.     On or about March 7, 2000, Mr. Courtney told me to order 3 credit reports. I ordered all 3 reports. Two printed on 3-7-2000 (exhibits 86A,B) and one on 3-9-2000 (exhibit 86C).

73.     He asked me to send these 3 credit reports to him along with verification of my Mother's paychecks and my Father's retirement income and we did.

74.     On 8-22-2000, at 17:09, eastern time, Mr. Courtney sent this fax from 703-764-2509 at "GLOBAL ED RESOURCES", to me in Tallahassee, Florida detailing a loan from Student Finance Corporation (SFC)(exhibit 87A,B). This document states "*Funds will be wired to St. Matthews*" (exhibit 87C). Under "Major Benefits" this document states " The SFC program allows the student to clear balances due to the school, to allow continuation of studies, be assigned a clinical rotation, and be allowed to graduate and receive transcripts." (exhibit 87D).

75.     One month later, on 9-22-2000, the State of Florida administratively dissolved SMU, "revoked for annual report" (exhibits 36E, 167A ).

76.     About three months later, in December 2000, SMU's Registrar, Gloria Miranda-Avila "Gloria", told me that clinical rotations were ready for me in Chicago.

77.     Gloria told me to apply for this SFC loan with my parents as cosigners. This is the Student Application and the Cosigner Application sent to us in Tallahassee (exhibits 88,89).

78.     I asked Gloria how much I should apply for and Gloria told me to apply for $29,000.

79.     At this time, SMU failed to possess a license to conduct business in the State of Florida and SMU was not licensed to offer or execute contracts with Florida consumers as SMU was administratively dissolved by the State of Florida about 3 months earlier on "9-22-2000" (exhibit 36E, 167A).

80.     Rodger Courtney's company "Global Education Resources" (GER)(exhibit 87B), failed to possess a license to conduct business in the State of Florida and was not licensed to offer or execute contracts with Florida consumers. Mr. Courtney is, and was at that time, licensed to practice law in the Commonwealth of Virginia.

81.     At this time, Student Finance Corporation (SFC) failed to possess a license to conduct business in the State of Florida and SFC was not licensed to offer or execute contracts with Florida consumers.

82.     Gloria at SMU and Porsche at SFC told me that the loan, for $29,000, was approved on or about January 4, 2001. I relied on Gloria and Porsche's statements and moved from Tallahassee, Florida to Chicago, Illinois on or about January 9, 2001, and began clinical rotations and began making monthly payments of $394.22 to SFC (exhibit 96).

83.     My parents and I applied for this loan for the purpose of going to clinical rotations in Chicago, and to pay off the medical school. The contract states (exhibit 87D) under "Major Benefits", "to allow continuation of studies, be assigned a clinical rotation" and "allows the student to clear balances due to the school,...", "and be allowed to graduate and receive transcripts."

MOVE FROM TALLAHASSEE, FLORIDA TO CHICAGO, ILLINOIS

84.     These are my leases for Chicago for 2001 and 2002 (exhibits 90, 91).

85.     Upon arrival in Chicago, I reported to the office of SMU's "Clinical Coordinator" (exhibit 20), Dr. Apantaku and began my clinical rotations. These images were taken in Dr. Apantaku's office and boardroom and include other SMU medical students who were present (exhibit 92,93). Dr. Apantaku gave me this card and wrote his pager number on it (exhibit 94A). Dr. Apantaku told us that he was the "President of the Board" of St. Mary's Advocate Hospital in Chicago (exhibit 95).

86.     In March and April 2001, I received calls from 4 individuals claiming to be SMU students. They told me their names were Burnice Mucius, Geneva Edwards, Debbie Stuart and Yvonne Patterson. Mrs. Mucius said her loan was for $45,000. Each one of them said they had not received their GER/SFC loan as promised. Each one of them said that there was a problem with their GER/SFC loan and they asked me if I had received my GER/SFC loan. I told them "no" because I was told by Rodger Courtney and by Gloria and by Porsche that the money would be sent to the school as stated in the GER/SFC contract "Funds will be wired to St. Matthews" (exhibit 87C).

87.     I called SMU. SMU confirmed that there was a problem with my loan as well but said they were working to resolve the issue.

88.    I spoke to one of these 4 individuals again from paragraph 86. She said that she had to sign some additional papers but that she had received her loan and that everything was fine.

89.    Throughout March, April and May of 2001, I asked Dr. Thornton, SMU's registrar Gloria, and others in SMU's office about the status of this loan. They told me that they were working to resolve the issue.

90.    On or about May 15, 2001, I called SFC. I asked SFC to send my payment history and it did, at 12:46 pm, central time, showing all payments made (totaling $1,576.88) on time and in full (exhibit 96).

91.    On or about that same day, I called SFC, I spoke with Porsche. Porsche gave me a story that was very different from the one than she had given me several time before in 2000 and early 2001. I asked to speak to her supervisor and she transferred me to Jean Lacey who transferred me to Jim Pearson.

92.    Mr. Pearson spoke to me as though he were a robot. I asked Mr. Pearson if the loan would be disbursed but he refused to answer me. I told him that I could not continue to make large payments on a loan I was not going to receive and that I would stop paying SFC if he could not give me an answer. He continued to repeat "SFC no longer does business with SMU", and he referred me back to SMU.

---------------------------------------------------------------------------------------------------

## THE LOSS OF MY MEDICAL SCHOOL RECORDS OCCURS HERE

93.    I believe that someone at SMU may have taken and kept the SFC loan money and that this act may have precipitated the following events.

94.    This article states that on June 4, 2001, an injunction barred the Searslands from entering SMU (exhibit 97A,B) and that Dr. Thornton was the new president (exhibit 97C) and Gloria Miranda-Avila is the new Director of Financial Aid (exhibit 97D).

95.    This later article from June 28, 2001 states that "before the injunction was served" on June 4, 2001, individuals "...were seen removing files from administrative offices." and "Witnesses observed shredded material in these offices..." (exhibit 99A) and Dr. Michael Harris posted a letter on June 2, 2001 stating "All property of St. Matthews University is to be made available to the officers of the Corporation..." (exhibit 99B).

96.    I believe the Serslands' took my medical school records and refused to give them back to SMU or they just simply shredded them.

97.    Please compare this official transcript, sent by SMU eleven months later in May 2002 (exhibits 133, 134), with this official SMU transcript from 2010 (exhibit 249). *Res ipsa loquitur.*

98.    SMU lost my medical school records. (exactly why these records are different is explained later).

99.    SMU had a duty to keep the records.

100.    Dr. Michael Harris' letter (exhibit 99B) that "All property of St. Matthew's

University is to be made available..." does not refer only to physical real estate but also to the missing records because the impetus for, and the event proceeding the injunction to seize the property was likely the "removing of files" and the "shredded material".

101.　This 2005 report by the State of California states that in the summer of 2001, there was "serious turmoil" at SMU "resulting in the eventual loss of all facilities there" (exhibit 187A,B).

101.　The medical school transcripts are the foundation of all future progress including clinical rotations (exhibit 120C,D,E), board exams (exhibit 134F, 249F), Residency (exhibit 209) and the foundation of Plaintiff's ability to repay student loans.

102.　I was not aware that the records had been lost and that I had a cause of action because SMU failed to tell me that it lost the records when SMU had a duty to keep the records. SMU performed certain acts to cover up the loss so that I would not notice.

103.　Damages flow from SMU's failure to keep these medical school records.
104.　Damages flow from SMU's concealment of the loss of these medical school records.

-----------------------------------------------------------------------------------------------------------

## THE COVER-UP

105.　Here begins the cover-up lasting for about 14 years and continuing to this day.
106.　The purpose of the cover-up was to conceal that the Plaintiffs had a cause of action (the loss of Plaintiffs medical school records).
107.　Damages flow from SMU's concealment of the loss of these records (Tort A, exhibit 1).

### ACT OF FRAUDULENT CONCEALMENT (COUNT 1)
### TOLLING THE STATUTE OF LIMITATIONS FOR FRAUD
### FIRST CONVERSATION WITH SMU'S ATTORNEY
### AFTER TRANSCRIPTS WERE LOST

108.　On June 13, 2001 at 4:57 pm, central time, (3:57 pm eastern time) I called SMU's attorney, Rodger Courtney, to ask him if he knew anything about the loan. About 10 days after these above events, described by the State of California as "serious turmoil" and "loss" (exhibit 187A,B), I spoke with Rodger Courtney for 8 minutes (exhibit 100A).

109.    Mr. Courtney gave me no indication whatsoever that these events had taken place about 10 days earlier.

110.    Mr. Courtney said he was working to resolve the failed GER/SFC loan. I told him what Jim Pearson with SFC had said. Mr. Courtney asked me to write down a detailed account of my conversation with Jim Pearson at SFC and he asked me to send this to him.

111.    Mr. Courtney said he purchased a 1 million/3 million dollar insurance policy for clinical rotations and that it's cost was nine-hundred-and-something dollars (I cannot remember the exact amount). I asked Mr. Courtney to send me this information but he failed to do so.

112.    In his resume, Mr. Courtney states "Negotiated medical malpractice contract between insurer and SMU" (exhibit 285F), but he places this under a different school, not SMU, and after June, 2001 (exhibit 285D).

113.    Mr. Courtney was not just an attorney, he claims he was SMU's "Special Council" "(3 years 1 month)" (exhibit 28A,B) and Mr. Courtney failed to tell me that my medical school records were lost when Mr. Courtney had actual knowledge that the records were lost.

114.    Mr. Courtney painted a deceptive picture with his statements and with his failure to disclose a materially relevant fact (the loss of the records). The picture he painted was meant to deceive me by concealing the loss of the records so that I would not be aware of my cause of action.

115.    Mr. Courtney may also have acted to deceive in order to conceal the way in which SMU had misrepresented the Federal Stafford loan program to me by SMU's Vice President in these emails (exhibits 61,62) and by SMU's marketing (exhibit 53). In his resume, Mr. Courtney states "Performed primary role in establishing the administration of financial aid and marketing" (exhibit 286C).

116.    As an attorney, SMU's "Special Council", by his "primary role in establishing the administration of financial aid and marketing", and by his possession of my family's financial information, Mr. Courtney could foresee that the result of losing my medical school records would be that I and my parents could not repay the loans offered by SMU (exhibits 84, 87, 143-148).

117.    Mr. Courtney could foresee that the loss of my medical school records had transformed his misrepresented Federal Stafford loans (exhibits 61,62) and other loans (exhibits 84, 87) into "toxic ticking time bombs" and that when those Stafford loans

25 of 91

defaulted (exhibits 143-148), if the lenders failed to do due diligence, they would file claims with the United States and be reimbursed by the United States and that those claims would be "False Claims" because SMU was not an "eligible education institution" within the meaning of 26 U.S.C. 221(d)(1) and (2).

118.    Mr. Courtney could also foresee that these "toxic ticking time bombs" he had placed into the student loan pipeline were not set to explode as false claims cases until many years after the statute of limitations had expired and little or no objective physical evidence, such as emails (exhibits 61,62), marketing catalogs (exhibit 53), promissory notes (exhibits 143, 146), phone records (exhibits 100, 101) and canceled checks (exhibits 102, 119) would exist.

119.    I believe evidence exists that Mr. Courtney's "toxic ticking time bombs" have already begun to go off.

120.    In 2014, I received this request from General Revenue Corporation (GRC) to sign a "Promissory Note" (exhibit 271E) combining all of the Federal loans from SMU "$60,870.44"(exhibit 271C). This request was not for any other Federal student loans but only for the Federal student loans I received from SMU (exhibit 271A,B,C) and giving me less than 7 days to do it (exhibit 271G).

121.    Federal law 34 C.F.R. 682.511(b)(1)(i), states;

(b) Documentation required for claims.

   (1)  The Secretary requires a lender to submit the following documentation with all claims:

   (i)  The original promissory note.

122.    The Lender and Servicer had filed claims several years before this 2014 letter, "claim filed with government" (exhibits 277F, 279F, 280F, 281F).

123.    The Lender and the Servicer, by law, had to submit "the original promisory note"(s).

124.    These are "true copies" of the original promissory notes submitted by the Lender and the Servicer in their claims (exhibits 143, 146).

125.    This is the proof that both the Lender and the Servicer did not need new promisory notes (exhibits 143, 146) because they had already submitted the original promissory notes and their claim was paid.

126.    This is the proof (exhibit 139, 142-150) that both the Lender and the Servicer knew as early as September 26, 2002 (exhibit 142), many years before they filed their claims, that these promissory notes were fraudulent.

127.    The Lender and Servicer knowingly misrepresented a Federal program, the William D. Ford Federal Direct Loan Program (exhibit 271D), to offer me loan consolidation, when both the Lender and the Servicer had actual knowledge that these loans would not qualify for that program.

128.    The purpose of the consolidation offer was so that the Lender and the

Servicer could obtain a legally enforceable "promissory note" ( exhibit 271E) to replace the fraudulent ones (exhibits 143, 146).

129.    I felt pressured (exhibit 271G) and I did not sign these documents.

## OBSTRUCTION OF JUSTICE AND THE SARBANES-OXLEY ACT (2 COUNTS)

130.    This adversary complaint is a core proceeding arising under Title 11. Plaintiffs Chapter 7 cases are both Title 11 cases. Plaintiffs believe the Sarbanes-Oxley Act of 2002, Title VIII, SEC. 802(a), as it amends Chapter 73 of title 18, applies with respect to Defendants FAME and General Revenue Corporation's requests to swap out these old promissory notes (exhibits 143, 146), for a new, single "Promissory Note" (exhibit 271E) (2 counts).

131.    Three months later I received a request to sign a new promisory note for other Federal loans totaling "$139,277.44" and giving me less than 48 hours to do so (exhibit 273G).

132.    I felt pressured (exhibit 273G) and I did not sign these documents.

133.    Three months later I received these 2 notices on the same day "to suspend our previous request to offset" (exhibit 274D, 275D), both making vague statements about "the circumstances that resulted in this suspension" (exhibits 274G, 275G) and telling me, in 6 different places, to contact the Internal Revenue Service with "any questions" about student loans (exhibits 274E,F,H, exhibit 275E,F,H).

134.    I believe the "circumstances" that resulted in this suspension are the discovery of Mr. Courtney's toxic ticking time bombs (exhibits 143, 146).

## ANY LENDER IS SUBJECT TO ALL CLAIMS AND DEFENSES THE BORROWER COULD ASSERT AGAINST THE SCHOOL

135.    Under 34 C.F.R. 682.209(g)(3), any lender holding a loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan because the school referred the borrower to the lender.

Plaintiffs assert all claims against the relevant lenders holding loans that are assertible against the school(s) under 34 C.F.R. 682.209(g)(3).
---Cascade----

### ACT OF FRAUDULENT CONCEALMENT (COUNT 2) SECOND CONVERSATION WITH SMU'S ATTORNEY AFTER TRANSCRIPTS WERE LOST

136.    Mr. Courtney claims in his resume that he was SMU's "Special Council"

from "May 1998-May 2001" (exhibit 286A,B). Mr. Courtney makes a misleading statement here by slipping out the critical month of June (the same month the records were lost (exhibits 97A,B, exhibit 99A,B)), re-defining "May 1998-May 2001" as "(3 years 1 month)" (exhibit 286B). This is important because Mr. Courtney is an attorney and he knows a false statement is defined according to the context in which it is used.

     137.    On July 5, 2001, I spoke with Mr. Courtney again for 12 minutes (exhibit 101A). Mr Courtney gave no indication whatsoever that he was no longer working for SMU. In fact, Mr. Courtney's statements and directions led me to believe just the opposite was true.

     138.    Mr. Courtney said he was still working to resolve the failed loan.

     139.    Mr. Courtney said that I would have to start paying SFC again.

     140.    Later that same night, I called my parents in Tallahassee, Florida, and I told them what Mr. Courtney said we should do (exhibit 101B).

     141.    The very next day, July 6, 2001 (exhibit 102A), at Rodger Courtney's direction and with no payment made to SFC since May 1, 2001 (exhibit 96), I started paying SFC again on Rodger Courtney's advice and SFC cashed the check (exhibit 102B).

     142.    Again, for the second time, Mr. Courtney failed to disclose a material fact (SMU lost my medical school records).

     143.    Again, for the second time, Mr. Courtney painted a misleading and deceptive picture.

     144.    Rodger Courtney directed me to continue making payments to SFC in order to set the stage for the next act of fraudulent concealment (affirmative act of fraudulent concealment Count 3)(exhibits 103-108).

     145.    Rodger Courtney made false and misleading statements (conversation 1 (exhibit), conversation 2 (exhibits).

     146.    Simultaneously with the unsealing of this action and complaint, Plaintiffs will file a Notice and Disclosure Statement with the Bar of the States of Florida, Illinois, the Commonwealth of Virginia and the District of Columbia, alleging, among other things that when taken together, Rodger Courtney's acts constitute the unlicensed practice of law in the states of Illinois and Florida and that Mr. Courtney demonstrates his awareness of this requirement in Florida by his hiring of this Professional Association (exhibit 165D).

     147.    Damages flow from Mr. Courtney's failure to keep his promise to lend Plaintiff's $29,000 (exhibit 87), his repeated failure to disclose a material fact (the loss of my medical school records (exhibits 100A, 101A)), His false statements (paragraphs #110, #111, #138, #139), his "primary role in...financial aid and marketing" (exhibit 286C) his failure to disclose other material facts and from his directions to do something

(paragraph #139) (continue to pay SFC (exhibit 101A, 102)) designed to further the deception (exhibits 103-108).

148.    I believe the true meaning of Mr. Courtney's statement, "Worked with U.S. Attorneys, DOJ, DHHS (HRSA) and OIG"(exhibit 286F), is that there was an investigation into this same matter, which Mr. Courtney spins into a resume builder.

149.    I believe it was this investigation which spawned this grossly fraudulent State of Florida document (exhibit 170) and this misleading document (exhibit 165). Someone else noticed this and drew a big box around it (exhibit 170B).

150.    Mr. Courtney engaged in self-arbitrage (exhibit 165) while avoiding a statement of any claims to create the illusion of distance between himself and SMU during this investigation (exhibit 286F).

151.    Mr. Courtney indicated SMU had failed to pay him a substantial amount of money, $91,895.09 (exhibits 165B) but he continued to work for SMU throughout this same time but he places this under a different school (exhibits 285E,F) not SMU, and did significantly more work for SMU shortly thereafter "Secured Florida approval for SMU to send medical students to Florida hospitals" (exhibit 286E).

RELEASE OF CLAIMS AND NONDISCLOSURE AGREEMENT

153.    About six weeks after these calls with Mr. Courtney, on or about 8-19-2001, SMU's registrar, Gloria and Dr. Thornton told me that the SFC loan offered by Mr. Courtney's company GER, was ready to be disbursed. I expected this as SMU's attorney, Mr. Courtney, had told me to expect this on at least 2 occasions (exhibits 100A, 101A).

154.    Dr. Thornton said that first, I would have to sign paperwork that would allow SMU to "initiate the transfer" as stated in this letter (exhibit 104A) included in this 5-page fax sent from SMU in Florida to me in Chicago on 8-20-2001 at 12:55 pm, central time (exhibits 103-107).

155.    SMU's Registrar, Gloria, told me that if I notarized this paperwork SMU could release the loan sooner (exhibit 107B). I faxed these documents back to SMU in Florida on 8-22-2001 (exhibit 108).

156.    Dr. Thornton and SMU's Registrar Gloria, knowingly made false statements to me using the promise to release the GER/SFC loan offered by Mr. Courtney's company (exhibit 87) to trick me into signing these documents (exhibits 103-107) promising not to tell anyone what had happened (exhibit 107A), and releasing "unknown claims" (exhibit 106A) furthering the concealment of a material event (the loss

of the records) of which I had no knowledge.

157. SMU is not and was not at that time, licensed to conduct business, enter into, or execute contracts with residents of the State of Illinois.

158. SMU was not licensed to conduct business in the State of Florida either, having been administratively dissolved as a corporation by the State of Florida exactly eleven months earlier on 9/22/2000 (exhibit 36E, 167A).

159. Plaintiffs believe this agreement to be voidable and request the Court to void or set aside this agreement because SMU failed to disclose a material fact (SMU failed to tell me that it lost my medical school records), and I relied, to my and my parents detriment, upon the nonexistence of the fact concealed.

## *RES IPSA LOQUITUR*
## AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT 1)

160. Plaintiffs request the Court to consider this agreement to be an affirmative act of fraudulent concealment because I was justified in assuming that the "Nondisclosure" clause (exhibit 107A) referred to the SFC loan and not the loss of the records and the Defendants used this agreement to silence the Plaintiffs and to attempt to release "unknown claims", furthering the concealment of the lost records.

161. These documents are not just a promise unfulfilled (exhibits 103-107). SMU had no intention of honoring this agreement because SMU failed to make any of the the "seven equal installments of $1,035.71" that Dr. Thornton had promised to make in his letter here (exhibit 104C).

162. Dr. Thornton knowingly makes this false statement when he writes "Student Finance Corporation has agreed to fund the "reserve" amount beginning immediately" (exhibits 106C) because I spoke with Mr. Pearson at SFC about three months earlier and he said "SFC no longer does business with SMU".

163. I relied on the illusion of resolution created by SMU's Vice President Jerry Thornton, it's attorney Rodger Courtney, and SMU's Registrar, Gloria, and they skillfully used that illusion to lie to me and to trick me in a coordinated fashion.

164. Damages flow from Rodger Courtney's associated misrepresentations (exhibits 100, 101, 102), from Dr. Thornton's false statements (exhibits 104-107), from SMU's Registrar Gloria's false statement (exhibit 103, 107B) and from their acts to conceal the loss of the records.

## SMU's VICE PRESIDENT JERRY THORNTON POSSESSED SCIENTER

165. In this letter accompanying this fax, SMU's Vice President Jerry Thornton demonstrates his *mens rea* as he attempts to attribute responsibility for his *actus reus* to the Serslands (exhibit 105).

166.   About 30 days later, on or about 9-21-2001, I received this bizarre letter from Sallie Mae stating "We are deeply sorry for this error", that my "personal information" was not "protected" and that an "error" occurred (exhibit 109A). This elaborate story SLM holds out about email attachments is not reasonable. I did not receive any such email, attachment or letter, and in the context of what I now understand about this case, I believe the true meaning of SLM's letter is that SLM improperly shared my personal information with one or more of the defendants in this case.

167.   I wrote to SLM asking for more information about this but SLM failed to respond as required of a loan servicer under 34 C.F.R. § 682.208(c)(1).

168.   My mother recently received such a letter, mailed from a similar address (exhibit 282), under SLM's fictitious Florida name Navient. stating that SLM/Navient has failed to protect her "personal information" and describes what it calls "suspicious activity" (exhibit 282).

169.   Sallie Mae/Navient repeatedly fails to protect Plaintiff's personal information.

170.   Damages flow from Sallie Mae's failure to protect Plaintiff's personal information.

## SALLIE MAE NOT LICENSED TO CONDUCT BUSINESS IN THE STATE OF ILLINOIS

171.   Servicing student loans is a business.

172.   SLM's business is to service student loans, SLM itself says so in their name "Sallie Mae Servicing" (exhibits 109B, 140C, 141K, 142).

173.   Federal law regulates the business of servicing loans provided under 20 U.S.C. § 1070 et. seq..

174.   SLM's license to conduct business in the State of Illinois was "withdrawn" (exhibit 113A) on "7-24-01" (exhibit 113B).

175.   SLM was not licensed to conduct business in the State of Illinois when it sent this letter (exhibit 109) and these subsequent letters (exhibits 140-141, 142).

176.   In the closing months of 2001, my life, my family's lives, and the lives of my Parents began to change forever. It is painful to remember this time and doing so causes me to be physically ill because it was only the beginning of a nightmare that would greatly increase in intensity and last for more than a decade.

177.   An individual who said his name was "Mr. Thompson" who claimed to be a "Loan Consultant" with SFC (exhibit 111A), began calling me in Chicago and my Parents (cosigners on the GER/SFC loan) in Tallahassee. I had never experienced the types of unreasonable statements, unconscionable threats and venom this person spewed and I worried about my Parents' health (my father was 73).

178.   I told Mr. Thompson I had not received the loan he was calling about and

that SMU and it's Attorney, Roger Courtney, were working to resolve this issue (exhibits100,101,103-107,).

179.   After several of these calls, this neighbor (exhibit 110), told me that a Mr. Thompson with SFC had asked her, to ask me, to call him, about a student loan he told her was in default.

180.   The next time Mr. Thompson called (1-14-2002), I wrote down some of what he said to me (exhibit 111). When Mr. Thompson continued his harassment, I filed a complaint against him and against SFC with the Federal Trade Commission (FTC) and with the Better Business Bureau (BBB) on or about 3-9-02 (exhibit 111C). The FTC did not respond, the BBB did respond (exhibit 1112).

181.   SMU was reinstated as a Florida LLC on December 10, 2001 (exhibit 36D, 167B).

182.   Plaintiff's request judicial notice of the laws of the State of Florida. The Florida Statutes (FS) § 605.0714 (5)

(5) A limited liability company that has been administratively dissolved continues in existence but may only carry on activities necessary to wind up its activities and affairs, liquidate and distribute its assets, and notify claimants under ss. 605.0711 and 605.0712.

183.   Plaintiffs believe that these SMU activities (exhibits 88,89, 100A,101A, 102, 103-107), between when it was dissolved in 9/2000 and when it was reinstated in 12/2001, are not "activities necessary to wind up it's activities and affairs" and these acts fail to comply with FS § 605.0714(5).

184.   Plaintiffs believe SMU's failure to comply with FS §605.0714(5) means SMU was not eligible for reinstatement under FS § 605.0715.

185.   When SMU failed to make any of these payments Dr. Thornton had promised (exhibit 104C) I called SMU. SMU said it would replace the SFC loan with a loan from SMU itself, told me to expect the paperwork and asked me to be patient.

185.   Around this time, SMU used the US mail to send these documents to me (exhibits 115-118). SMU's Registrar Gloria said that SMU would now act as the lender itself. Gloria instructed me, my Mother and my Father to sign this and to "back-date" it to this date (exhibit 115A), because she explained that this was "replacing" the SFC loan for $29,000 (exhibit 115B) and I began making payments directly to SMU instead of SFC (exhibit 119).

186.   I am certain that SMU knows how to spell it's own name, but SMU misspelled it's own name in the signature block on page 4 above the line styled as "Seller" (exhibit 118). By misspelling it's own name, SMU may obfuscate a lien search and the lawful reporting of such a lien to the Florida Department of State's Division of Corporations as required under Part IV, § 713.901(3)(c) of the Florida Uniform Federal Lien Registration Act (FUFLRA).

187.   Plaintiffs believe Rodger Courtney is the author of these 2 sets of

documents (exhibits 105-107 and 115-118) because they introduce previously non-existent conditions such as nondisclosure and arbitration requirements while failing to mention the material fact (loss of the records) that both requirements are designed to conceal.

### AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT )

188.    Plaintiffs ask the court to set aside this agreement and instead to consider it to be an act of fraudulent concealment because I was unaware that SMU had lost my medical school records and because this exhibit contains 4 legal size pages of small font print when the original loan application is here (exhibits 88,89) and contained no such conditions.

### THE COOK COUNTY HOSPITAL (CCH) ROTATION IN TRAUMA SURGERY

189.    From 5/6/2002 to 5/31/2002, I performed a senior clerkship in trauma surgery at Cook County Hospital (CCH) in Chicago, Illinois (exhibits 114, 121B). These are some of the patients that I saw on this rotation (sealed envelope #3). This rotation was performed at a Graduate Medical Education (GME) training program, accredited by the Accreditation Council for Graduate Medical Education (ACGME), a Federally funded program under the U.S. Department of Health and Human Services. Because this was a GME training program, certain requirements had to be met (exhibit 120A,B,C,D,E). One of those requirements was " An official transcript showing clerkships completed,... . Please Note: The application and transcript must be sent by the medical school. **Applications received directly from you will not be processed.**" (in bold type, exhibit 120D,E).

190.    SMU lost the records 11 months earlier, in June of 2001. SMU owed Plaintiff a duty to keep the records it lost.
191.    If SMU failed to send the records I would not have been allowed to do the rotation, the rotation would have come to a full stop and the loss of the records may have been discovered at that time.

### AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT 5), CRIMINAL CONSPIRACY BETWEEN SMU AND IT'S CLINICAL COORDINATOR TO CONCEAL THE LOSS OF THE RECORDS (COUNT 2)

192.    On May 3, 2002, at 12:11pm (central time) this fax was received by CCH (exhibits 121-132). It was sent from SMU's Clinical Coordinator, Dr. Frank Apantaku M.D., in Chicago (exhibit 122E).
193.    SMU fabricated the missing transfer records (exhibit 131) and its own missing records from 1999 (exhibit 131, 132) using it's best guess and sent them to CCH,

further concealing the loss of the records.

## SMU DEMONSTRATES IT'S DUTY TO KEEP THE RECORDS

194.    Plaintiff was not suppose to keep the Plaintiff's own records. Plaintiff's medical school, St. Matthews University was suppose to keep the records.

195.    By sending these official records (exhibits 121-132), signed by SMU's Registrar (exhibit 132A) and containing the seal of SMU (exhibit 132B), SMU demonstrates it's understanding of it's duty to keep the official records.

## "FALSE STATEMENTS RELATING TO HEALTH CARE MATTERS" UNDER 18 U.S.C. § 1035; "DEFINITIONS RELATING TO FEDERAL HEALTH CARE OFFENSES" UNDER 18 U.S.C. § 24
### (2 COUNTS)

196.    The Graduate Medical Education (GME) program at Cook County Hospital is a Federally funded program under the U.S. Department of Health and Human Services. This GME program is a "health care benefit program" under 18 U.S.C. § 24 (b) and 18 U.S.C. § 1035 (b). The made-up, false records SMU sent to this program twice (exhibits 121-132, 133-144), are each "False statements relating to health care matters" under 18 U.S.C. § 1035 (a)(1)(2) and "Federal health care offenses" under 18 U.S.C. § 24 (a)(1).

## "SPECIAL DAMAGES" (COUNT 2)

197.    SMU irreversibly and permanently damaged me and did end my medical career when it pushed the "send" button on it's fax machine at 12:11pm (central time), on May 3, 2002 (fax exhibits 121-132), sending made-up, false records to a GME program at Cook County Hospital.
Plaintiff alleges that sending these false records caused "special damages" to the Plaintiff and that "special damage" is the following;

198.    I cannot complete my medical training as a Resident Physician graduate from any medical school because all residency programs are unified GME programs and they will notice the difference in the records.

199.    SMU's act of sending false records tainted me.

200.    GME residency programs do not accept tainted students (exhibit 209) and will repeatedly reject a tainted student (exhibits 207, 208).

## AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT 6)
## "SPECIAL DAMAGES" (COUNT 3)

201.    5 days later, on May 8, 2002, at 04:56pm (central time)(exhibit 133G), this fax was received by Cook County Hospital directly from SMU's office in Florida

(exhibits 133-134).
It contains the signature of SMU's registrar (exhibit 134A) and SMU's seal (exhibit 134E).

202.    They are the same as pages 13 and 14 of the fax from Dr. Apantaku's office 5 days earlier (exhibits 131, 132).

203.    SMU irreversibly and permanently damaged me again and did seal the end of my medical career when it pushed the "send" button again on it's fax machine at 4:56pm (central time) on May 8, 2002 (exhibit 133G).
Sending these false records again, further caused "special damages" to the Plaintiff (Count 3), for the same reason given in count 1.

204.    Sending made-up records again, further concealed the loss (fraudulent concealment count 6).

### AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT 4)
### "SPECIAL DAMAGES" (COUNT 1)

205.    There should also be another fax, the "Mystery Fax" (exhibit 135), sent from SMU in Florida to Dr. Apantaku's office and consisting of at least 2 pages, probably sent on the morning of May 3, which Dr. Apantaku then passed along to CCH as pages 13 and 14 of his fax on May 3, 2002 (fax #2). It was the first fax in this set of 3 faxes (exhibit 135) and it shows that SMU's Clinical Coordinator in Chicago, Dr. Apantaku, combined records from SMU's Florida office, which he knew were false, with his own records which he also knew were false, and then faxed those false records to the GME program at CCH. This is why this first fax is fraudulent concealment "count 4" and special damages "count 1".

### AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT 7)
### CRIMINAL CONSPIRACY BETWEEN SMU AND IT'S CLINICAL
### COORDINATOR TO CONCEAL THE LOSS OF THE RECORDS (COUNT 2)

206.    Dr. Apantaku cannot claim that he did not know the records were lost, and that the records he was passing on to CCH were fabricated because Dr. Apantaku had made up a variety of excuses for failing to release the grade for every final exam taken in his office after June, 2001 (exhibits 123,128 ,129, 130).

207.    Dr. Apantaku sent false records as well. For example, I have never met "Dr. Jayesh Madhani" (exhibit 129B) and he has no idea who I am, even though there are personal comments entered here (exhibit 129C) and his signature appears here (exhibit 129B1).

208.    This is a false record.
--fails to comply-- Ill combined statutes (720 ILCS 2/17-3) (Ch. 38, para. 17-3) 2 counts

209.    This Medicine rotation (exhibit 129) was performed under the daily supervision and guidance of Dr. Waqar Mian, who wrote this recommendation for me

stating this fact (exhibit 136C). Dr. Mian mailed it to me in this envelope (exhibit 137). These are some of Dr. Mian's patients I examined on this Medicine rotation (sealed envelope #1).

## EXPERT TESTIMONY

210.    Dr. Waqar Mian is an expert. He is the "Attending Hospitalist/Lead Physician" (exhibit 136B). Dr. Mian writes "I believe he will be an excellent physician" (exhibit 136D) and "I highly recommend Rodney Rooks" (exhibit 136E).

## HOW I OBTAINED THESE RECORDS

211.    A few days into this CCH rotation I spoke again with the medical student office about the difference between it's requirement of 8 weeks for Peds and OB/GYN (exhibit 120F,G) and my 6 weeks for Peds and OB/GYN (exhibits 128B,123A). She said that the difference was "ok" and explained why. As we discussed this, she said "You can write down my name" , and I did (exhibit 120J) and she said "I can give you a copy of what's in your file", and I said "ok".

212.    Because Dr. Apantaku had failed to release a final exam score for rotations after June 2001, my attention was drawn to these rotations (exhibits 123,128,129,130). I looked at my final grade and the rotation title. They looked appropriate. These papers went into my records box for many years.

213.    I did this rotation with another SMU student. His name was Robert Jackson (exhibit 138). While looking at these records Robert asked me what I was looking at and I told him. Robert said "I think I'll go get my records too". I do not know if Robert obtained his records but both Robert and his parents have refused to speak with me. Robert would speak to me, unless he had signed a secret settlement agreement preventing him from doing so.

214.    A few months earlier, back in January, 2002, when Mr. Thompson's said "See you in Court" (exhibit 111B ), I believed he was going to sue me so I thought I should get all of my student loan information in order.

215.    I wrote to SLM for 7 months asking for these records but SLM failed to respond at all when SLM is required to respond within "30 days" to this type of request under 34 C.F.R. § 682.208(c)(1).

216.    SLM is required under 34 C.F.R. 682.511 (b)(vii) to keep these requests "all correspondence" as a requirement under (b) "Documentation required for claims".

PLAINTIFF'S REQUEST FOR PRODUCTION FROM SALLIE MAE,
SPECIFICALLY TO INCLUDE ALL CORRESPONDENCES UNDER
34 C.F.R. § 682.511(b)(vii)- "Documentation required for claims" (exhibit 138-1D).

217.    I grew frustrated with SLM's failure/refusal to provide this basic loan servicing information. I wondered about the apology letter SLM had sent to me (exhibit 109). I wondered why SLM was stalling and ignoring me.

218.    When SLM failed to provide any information, I sent a student loan "Notice and Dispute" to SLM via the United States Postal Service by Certified Mail. On 7-22-02, SLM signed for my "Notice and Dispute" (exhibit 139A), PS form 3811 (139 A), Certified Mail Receipt-PS form 3800 (139 B), USPS cash register receipt (139 C), for cash.

FAILURE OF A STUDENT LOAN SERVICER TO EXERCISE "DUE DILEGENCE" IN THE SERVICING OF STUDENT LOANS UNDER 34 C.F.R § 682.208(a)(c)(1).

34 C.F.R. § 682.208  Due diligence in servicing a loan.
  (a)  The loan servicing process includes..., responding to borrower inquiries,..
  (c)(1)  A lender shall respond within 30 days after receipt to any inquiry from a borrower....

219.    Defendant Sallie Mae signed for Plaintiff's notice on July 22, 2002 (exhibit 139) but did not respond until September 19, 2002 (exhibit 140A), 60 days later asking for "additional time" (exhibit 140B).

220.    Defendant Sallie Mae had a duty to respond "within 30 days".

221.    Defendant Sallie Mae failed to comply with 34 C.F.R. § 682.208(a)(c)(1).

222.    Plaintiffs were harmed by Defendants failure. Damages flow from Sallie Mae's failure.

224.    On 9-26-02, SLM sent true copies of the lender's promissory notes from SMU (exhibits 143-146) in this envelope with SLM's name on it (exhibit 142).

225.    The document's upper left states "TRUE COPY" (exhibits 143A, 146A) and the lower right corner states "LENDERS COPY" (exhibits 143C, 146C).

226. These promissory notes "scream" fraud.

THE PROMISORY NOTES FROM SMU

227.    Exhibit 143 is the SMU Title IV Stafford loan Dr. Thornton and I are discussing in email exhibits 61 and 62.

228.    This promissory note (exhibit 143) has been changed at least 8 times (not by me) after I gave it to SMU (exhibit 143 #1,#2,#3,#4,#5,#6,#7,#8).

229.    The total loan amount has been altered (exhibit 143 #3).

230.    The initial "JR" appears beside it (exhibit 143 #2). This is a forgery. These are not my initials. My initials from about 3 months later appear here (exhibit 61G) and here (exhibit 62E) and about 32 months later here (exhibit 106B).

231.    This title IV promissory note fails to carry the "School Name", "School

Code Branch", "School Certification", "Signature of Authorized School Official", and the "Signature of Authorized Lending Official" as well as other information required by the Secretary for participation in the FFEL loan program under Federal Law.

999.    The Guarantor is "Finance Authority of Maine" (exhibit 143B).

232.    The lender is "KEY BANK, USA C/O USA GROUP LOAN SERVICES" (exhibits 144C, 145C).

233.    The next title IV promissory note from SMU contains even less required information (exhibit 146) and this is not my handwriting here (exhibit 146D), here (exhibit 146E), here (exhibit 146F) or here (exhibit 146G).

999.    The Guarantor is "Finance Authority of Maine" (exhibit 146B).

234.    The lender is "KEY BANK, KEY EDUCATION RESOURCES" (exhibits 146D, 147C, 148C).

34 C.F.R. §682.206(b)   DUE DILIGENCE IN MAKING A LOAN

235.    34 C.F.R. § 682.206   Due diligence in making a loan.
(b) Processing forms.   Before disbursing a loan, a lender must determine that all required forms have been accurately completed by the borrower, the student, the school, and the lender. A lender may not ask the borrower to sign any form before the borrower has provided on the form all information requested from the borrower.

FAILURE OF A STUDENT LENDER TO EXERCISE "DUE DILIGENCE" IN THE MAKING OF A LOAN UNDER 34 C.F.R. §682.206(b)
(2 COUNTS)

236.    Defendants, Guarantors and "lenders" Finance Authority of Maine, Key Bank USA, USA Group Loan Services, Key Bank and Key Education Resources failed to comply with 34 C.F.R. § 682.206(b) regarding these promissory notes (exhibits 143, 146).

237.    The Lenders and SLM cannot claim that they did not know that these were not qualified education loans. These four documents, included with the promissory notes, shows that all of these loans have been flagged, twice, as of 9/26/2002. In four separate places on four separate documents it states, " *    FLAG ELECTRONIC APPLICATION * ", in capital letters and between stars (exhibits 144A, 145A, 147A, 148A).

238.    Approximately six weeks after receiving this information, I sent another student loan "Notice and Dispute" to SLM. On 12-2-02 (exhibit 149A), SLM signed again for another student loan "Notice and Dispute", PS Form 3811 (exhibit 149A),

Certified Mail Receipt PS Form 3800 (exhibit 149B), USPS cash register receipt (exhibit 149C), for "Personal/ Check" in the amount of $26.52 (exhibit 149D), and the personal check for $26.52 (exhibit 150).

239.    SLM completely ignored this notice and failed to respond to this notice at all when SLM is required under 34 C.F.R. 682.208(c)(1) to "respond within 30 days".

FAILURE OF A STUDENT LOAN SERVICER TO EXERCISE "DUE DILIGENCE" IN THE SERVICING OF STUDENT LOANS UNDER 34 C.F.R. § 682.208(a)(c)(1).

240.    Defendant Sallie Mae/Navient signed for Plaintiff's second notice on December 2, 2001 (exhibit 149) but failed to respond at all when Sallie Mae/Navient had a duty to respond "within 30 days". Sallie Mae/Navient failed to comply with 34 C.F.R. § 682.208(a)(c)(1).

241.    Plaintiffs were harmed by Defendants failure. Damages flow from Sallie Mae/Navient's failure.

### RETURN TO TALLAHASSEE FROM CHICAGO

242.    I returned to Tallahassee, Florida in March of 2003.

243.    In March or April 2003, I received this invitation to graduation from SMU, referring to me as a "Graduate", "Dear Graduates" (exhibit 151,I), "your diploma" (exhibit 151K), signed by the president, Dr. Michael Harris (exhibit 151A), mentioning "graduation" 7 more times (exhibit 151, #1,#2,#3,#4,#5,#6,#7) and congratulating me for "what you have accomplished". In this letter, the president refers to SMU as " your "new" St. Matthews University School of Medicine" (exhibit 151B).

244.    I contacted SMU to make graduation arrangements. I spoke with Darlene Burke. Ms. Burke said I owed SMU approximately $22,000. She said my graduation paperwork could not be processed until this was fully paid. I told her that I and my parents had already signed 2 loans for $29,000 (exhibits 88,89, 115-118) and this could not be correct. I asked Ms. Burke for an invoice.

245.    Ms. Burke then said that I would be allowed to graduate and said she would send an invoice if I filled out some forms.

246.    Ms. Burke mailed these 4 documents to me (exhibits 152-155). This form that she sent to me titled "St. Matthew's University Clinical Core Registration Form" (exhibits 154A) states " Any student who proceeds in a rotation without registration will NOT receive credit for that rotation." (exhibit 154B). Ms. Burke sent this "Registration Form" to me and asked me to fill it out more than a year after these rotations began.

247.    I filled them out and faxed them back to SMU on 6-27-2003 at 11:15am (exhibit 156A,B).

248.    Three days after I faxed these back to SMU Ms. Burke sent the following invoice (157-162).

INVOICE WITHOUT CCH ROTATION AND NO ORIGIN

249.     On 6-30-2003, at 3:33pm, SMU sent this fax of invoices to me in Tallahassee, Florida (exhibits 157-162), showing "Payments/Credits $-2,375.08" (exhibit 159A).

250.     The origin of this fax has been omitted (exhibits 158A, 159D, 160D, 161D, 162D), not by the Plaintiffs, and "Feb.12. 1996" appears at the bottom of each page when this is not true (exhibits 158B, 159E, 160I, 161F, 162F).

251.     I believe this is a false statement and an attempt to conceal the origin of this fax.

252.     This invoice is a financial deception. It has a purpose and it has a method. It's purpose is to draw the readers attention away from the one charge which is not listed but should be, the Cook County Hospital (CCH) rotation, which should be here (exhibit 161A), between "4/26/02" (exhibit 161B) and "6/28/02" (exhibit 161C), but it is not. It skips 1 month, the month of May 2001 which was the CCH rotation (exhibits 121-134, sealed envelope #3).

253.     It's method, to draw the attention of the reader away from this critical omission, is to generously salt the invoice with multiple "administrative fees" (exhibit 159F, 160E, 160F), multiple "late fees" (exhibit 161E, 162A,B,C) and overcharges such as this overcharge of $6,400 (exhibit 160C) for "Tuition-...September 2002" (exhibit 160H), (fall semester 2002), when my last rotation ended three months earlier in June 2002 (exhibit 248). This also moves 4 weeks of the missing tuition fees from the omitted month of May, 2002, to the end of the invoice.

ACT OF FRAUDULENT CONCEALMENT (COUNT 9)

254.     SMU's accountant, Darlene Burke, failed to charge me for the CCH rotation. SMU should have charged me for the CCH rotation because SMU had a greater awareness of this rotation than all other rotations (exhibit 135).

255.     I believe that SMU's failure to charge for this rotation was intentional and meant to conceal the existence of the rotation because SMU was required to, and did, provide records and those records were fabricated by SMU (exhibits 121-134).

256.     Darlene Burke is, and was at the time, a Certified Public Accountant, licensed by the State of Florida's Department of Business and Professional Regulation (exhibit 21). This PTIN directory lists a former SMU address (exhibit 22) and her name and signature appears on these SMU, Florida Corporation documents (exhibits 171, 172).

257.     Simultaneously with the unsealing of this action and complaint, Plaintiffs will provide to The State of Florida Department of Business and Professional Regulation a Notice and Disclosure Statement alleging Defendant Darlene Burke, acting as SMU's accountant, failed to charge me for the Cook County Hospital rotation (exhibit 161A).

258.    After receiving this fax, I spoke to Darlene Burke again. I told her that I disagreed with these invoices. She said " You have to pay whatever SMU says you owe".

259.    On 9-3-2003, Sallie Mae states "A negative credit report can impact your future plans to purchase a home or car." (exhibit 163B), falsely describes these loans as "FFELP" loans (exhibits 163E, Exhibit 164D,E,F) when it had actual knowledge that they were not "FFELP" loans (exhibits 143-148) and falsely represents the character (exhibits 163E, 164D,E,F), amount (exhibits 163F,G,H) and legal status of the debt (exhibit 163C).

Plaintiff's Trans Union (TU) credit score is a "3" (exhibit 276D). TU states "Your credit ranks higher than 0% of the American consumers" (exhibit 276A).

Plaintiff's Equifax credit score is a "3" (exhibit 276E). Equifax states "Your credit ranks higher than 0% of the American consumers" (exhibit 276B).

Plaintiff's Experian credit score is a "585" (exhibit 276F). Experian states "Your credit ranks higher than 13% of the American consumers" (exhibit 276C).

Defendant Sallie Mae wrongly and unjustly damaged Plaintiff Julian Rodney Rooks Jr.'s credit ratings because it failed to exercise the required due diligence.

Damages flow from Sallie Mae's failure.

## FAILURE OF A STUDENT LOAN SERVICER TO EXERCISE "DUE DILIGENCE" IN THE COLLECTING OF STUDENT LOANS UNDER 34 C.F.R. § 682.509(b) "SPECIAL CONDITIONS FOR FILING A CLAIM" (COUNT 1-4)

34 C.F.R. § 682.507(a)(1)...a lender shall exercise due diligence in the collection of a loan...
34 C.F.R. § 682.509   Special conditions for filing a claim.
(b) A lender may not as a result of a claim filed with the Secretary under this section report a borrower's loan as in default to any credit bureau or other third party.

Defendant Sallie Mae/Navient, Finance Authority of Maine and "General Revenue Compan" (exhibit 278B) reported Plaintiffs loans as in default, "Defaulted" (exhibit 277E, 279E, 280E, 281E) to a credit bureau, after the claim was filed "Claim filed with government" (exhibit 277F, 279F, 280F, 281F).
Defendant Sallie Mae and General Revenue Corporation failed to exercise the required "due diligence" in the collecting of a student loan under 34 C.F.R. § 682.509(b).
The failure of Defendants Sallie Mae and General Revenue Corporation to

41 of 91

comply with the requirements of this part injured the Plaintiff.

Damages flow from Defendants Sallie Mae and General Revenue Corporation's failure.

Defendants failed to exercise the required due diligence in the making (exhibits 143-148), servicing (exhibits 139, 140-141, 149, 163-164) and collecting (exhibits 214-229, 250-259, 271-272, 273, 276-282) of student loans.

On 9-19-2003, the State of Florida administratively dissolved SMU "REVOKED FOR ANNUAL REPORT" (exhibit 36C, 167C).

On December 16, 2003, Mr. Courtney filed a judgment lien in the State of Florida against SMU in the amount of $91,895.09 (exhibit 165) using this Professional Corporation (exhibit 165D). Mr. Courtney's use of a Professional Association demonstrates his awareness that he was not licensed to practice law in the State of Florida.

On February 2, 2004 the State of Illinois "REVOKED" SFC's corporate license (exhibit 166).

RESTRUCTURING SMU (exhibit 167, 167-1)

Six months after being dissolved, SMU filed for and received a new Florida license as a foreign corporation with the same old Officers and Directors of SMU posing as the new Officers and Directors of the new foreign corporation (exhibit 167). This "new" foreign Corporation, in fact, the same old SMU, was merged into SMU Acquisition Corp., a Delaware corporation and surviving entity of the merger and then it's name was changed to SMU Inc., a Florida Corporation (exhibit 167).

This State of Florida document states "The Surviving Corporation shall thereafter be responsible and liable for all liabilities and obligations of the Merged Company, and neither the rights of creditors nor any liens on the property of the Merged Company shall be impaired by the merger." (exhibit 167-1).

SMU'S APPLICATION FOR SMU CAYMAN TO TRANSACT BUSINESS IN THE STATE OF FLORIDA

The web path and domain addresses of these documents (exhibits 168-175) are memorialized as video exhibit #7.

This application contains 8 pages (exhibits 168-175).

PAGE 5 OF THE APPLICATION (exhibit 172)

Darlene Burke, SMU's "Registered Agent" (exhibit 172G,H) made a false statement to the State of Florida here on line 6 when she wrote "upon qualification" when she knew this was not true (exhibit 172D). This is not a mistake. This is not a wrongly checked box or wrongly circled item, these are 2 written words, obtained from reading the qualifier written under line 6 "If corporation has not transacted business in Florida, insert "upon qualification" (exhibit 172C).

I did not speak to a random person at SMU, I spoke to Darlene Burke about this SMU Cayman letter addressing me as a "Graduate" and inviting me to graduation and offering a contract (exhibit 151,H). Darlene Burke told me that she was sending these faxes (exhibits 157-162) and these SMU Cayman invoices (exhibits 160J, 161G, 162G) and they were to and from Darlene Burke.

Darlene Burke failed to fill out line 8 (exhibit 172E).
This letter from the Florida Department of State indicates Ms. Burke failed to "state a PURPOSE" on line 8 (exhibit 170B). This is the line where SMU is required to state it's "Purpose(s)" of "lawful activity" (exhibit 172F) and "will have such powers as not prohibited by law" (exhibit 173).

I believe Darlene Burk's failure to write this statement on line 8 to be a powerful indicator of SMU's intent.

The State of Florida may have inserted this application into a typewriter and filled out line 8 for SMU because the continued statement from line 8 (see asterik) is on the following page, page 6 (exhibit 173), and page 6 is not stamped "FILED" at all while page 5 is stamped "FILED".

PAGE 6 OF THE APPLICATION (exhibit)

Page 6 (exhibit 173), contains no stamp while page 5 is stamped (exhibit 172A). I believe page 6 is not stamped because it did not exist when page 5 was received (exhibit 172A).

Technically, SMU may not have stated that it would use it's business for "lawful activity". That statement may have been written in by the Secretary of State of the State of Florida.

FLORIDA DEPARTMENT OF STATE LETTER
PAGE 3 OF THE APPLICATION (exhibit 170)

This letter is stamped as "FILED" (exhibit 170C) three days before it was written (exhibit 170A).

This letter was stamped "FILED" three days before it existed.

Please look at the "RECEIVED" stamp (exhibit 170E). At first glance it appears to be a stamp made by a malfunctioning stamp machine. However, by enlarging this stamp, the following can be seen (exhibit 176):

What appears to be one stamp is, in fact, at least 5 separate stamps from at least 2 different State of Florida agencies (exhibit 176).

stamp #1   the words "STATE" and "FLORIDA", comprising stamp #1,
stamp #2   the words "STATE" and "FLORIDA", comprising stamp #2,
stamp #3   the word "CORPORATIONS", comprising stamp # 3,
stamp #4   the word "CORPORATIONS", comprising stamp # 4, and
stamp #5   a concealed stamp.

This concealed stamp, stamp # 5 (exhibit 177) has been covered up by at least 5 strips of white-out tape (exhibit 177 #1,#2,#3,#4,#5).

The right edge of the last letter "D" in "RECEIVED"or "FILED"  is still visible (exhibit 177).

These lines, called "noise", have been intentionally added to make these 5 stamps appear to blend together in a single stamp resulting from a mechanical stamp malfunction (exhibit 177).

There are more stamps concealed here because the lines are obliterated by the white-out tape, but were there before the tape was laid down (exhibit 177).

The State of Florida cannot claim that it did not try to conceal this material date (exhibit 178), on this material document (exhibit 178) in this material application (exhibits 168-175). These dates are material because the State itself is pointing out deficiencies in SMU's application and it was the granting of this license (exhibit 167) by which the Defendants restructured the corporation for the purpose of circumventing the provisions of title 11.

I believe these marks are evidence that this document has been extensively and repeatedly cut, copied and pasted (exhibit 179 A,B,C,D,E,F,G,H).

This letter appears to have been written by "Buck Kohr Document Specialist" (exhibit 170D).

Buck Kohr is listed by the US Copyright office as the "author" (exhibit 180A) of a valid Federal copyright (exhibit 180B) categorized as a "parable" (exhibit 180C),

published in 1978 (exhibit 180D) titled *The Old Snake who Took the Frogs for a Ride*"
(exhibit 181).

The State of Florida should be required to produce Buck Kohr.

This document (exhibit 170) may have been fabricated by the Florida Division of
Corporations and/or, or in concurrence with, the Florida Department of State at a later
date, after the State discovered the pre-existence of claims and the potential for future
claims, and then added to the application to make it appear as though the State of Florida
had required SMU Cayman to do these things at an earlier date.

This document is a fraud (exhibit 170),
wrapped inside a fraud (exhibits 167-179).

The State of Florida cannot claim that it does not recognize these entities as one
and the same because the Florida Department of Education describes "St. Matthew's
University School of Medicine" as "Licensed since: 1/1/1999" (exhibit 40A).

Plaintiffs allege the purpose of this application and license was not in the normal
course of business. SMU's normal course of business had already been established by
dissolution and reinstatement as it was in (exhibit 167A,B,C).

This is the proof that SMU Cayman was conducting business in the State of
Florida for about a year before it applied for a license to do so, offering a contract it
describes as a "special offer" (exhibit 151,H), on SMU Cayman's letterhead (exhibit
151C) and sending multiple financial invoices (exhibit 160J, 161G, 162G) in a concealed
manner (exhibits 158A,B, 159D,E, 160D,I, 161D,F, 162D,F).

FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(e)(2)(b)

The true purpose of this application and license was in it's misuse of the law as a
legal trick to restructure the corporation to avoid responsibility for, and payment of,
Plaintiffs valid claim for damages which existed in 2001 but was only recently discovered
due to the fact concealed. Plaintiffs believe this application and the resulting license
restructuring SMU, represents a fraudulent transfer as set forth under 11 U.S.C. § 548(e)
(2)(b) made in contemplation of a case under Title 11 (there are now 2) and with intent to
defeat the provisions of title 11.

AFFIRMATIVE ACT OF FRAUDULENT CONCEALMENT (COUNT 10)

Plaintiff's request the court to consider Defendants restructuring of SMU to be an
act fraudulent concealment.

## "YOU EITHER ARE, OR YOUR'E NOT"

In 2005 I received a certain and specific threat from an individual who claimed to be an employee of the US Department of Education "calling on behalf of St. Matthews University". I drove from Tallahassee to the SMU office in Oviedo on or about 11-04-2005. Dr. Thornton introduced me to several of the office staff in the following manner, "This is one of our Graduates, Dr. Rooks". There is a witness to these introductions.

In this video, Dr. Thornton says "you either are, or you're not", "you're still not a doctor til' the president says you are" (video exhibit #8, exhibit 182).

The President says that I am a "Graduate" (exhibit 151,I).

This invitation to graduation letter, written on SMU Cayman's letterhead and sent to me by the President of SMU is signed by the President (exhibit 151A).

The President calls me a "Graduate" (exhibit 151,I), says "your diploma" (exhibit 151K) and further refers to graduation another seven times (exhibit 151- 1,2,3,4,5,6,7).

Plaintiff Julian Rodney Rooks Jr. is a graduate of St. Matthews University School of Medicine.

(Exhibit 56A) "This document describes the system employed by St. Matthews University School of Medicine for considering matters of student progress...". (exhibit 56B) "Promotion from one curriculum unit to the next and graduation from the program with the granting of the M.D. Degree are based on satisfactorily meeting the performance standards established by the faculty." (exhibit 57) "Promotion from semester to semester requires satisfactory completion of all course objectives in the preceding curricular segment."

Plaintiff has been wrongly denied the economic benefit of the MD degree.

I met with Dr. Thornton for approximately 30 minutes in his office. I told Dr. Thornton what the DOE had said. I told Dr. Thornton about the financial crisis, harassing telephone calls and the hardship my parents and family were going through as we tried to keep up the student loan payments. As Dr. Thornton looked through my student file he told me that SMU would take back the account it had sent for collections if I paid SMU $1,000.

I paid SMU $1,000 at this meeting and SMU cashed the check (exhibit 205A). I noticed that my student file was approximately a half-inch thick. I asked Dr. Thornton for a transcript, approval to sit for the medical board exam and my diploma. He said that SMU could not do that as long as I had a balance owed to SMU. He told me that if I made a few payments of $400 that SMU would certify me to take the board exam. I left SMU's office and began making payments of $400 (exhibits 183, 205B,C,D,E) but SMU still refused to allow me to take the board exam or release a transcript.

## ACT OF FRAUDULENT CONCEALMENT (COUNT )
Dr. Thornton failed to tell me that SMU had lost my records.

"SPECIAL DAMAGES" (COUNT 4)

Dr. Thornton aggravated the damage to Plaintiffs by demanding and receiving more money.

In this video (video exhibit #9, exhibit 184), Dr. Thornton states his foresight of the harm in his acts, "It's been a long road", "it takes a character, it takes patience, n endurance and long-suffering, the will to succeed, and some of the parents might say a fair amount of money", "Some fell out along the way".

### DR. JERRY THORNTON MAKES A LOT OF FALSE AND MISLEADING STATEMENTS TO A STATE EVALUATOR

Exhibts 185-193 are selected pages from a report issued by the State of California's Division of Licensing.
Page four describes "Jerry Thornton" as "the principal contact between SMUSOM and the Division" (exhibits 189A,B).
Page sixteen of this report focuses on SMU's relationship with St. Joseph's College of Maine (SJC) and contains several misrepresentations material to this case.

This statement (exhibit 192A) is not true. These emails from SMU's Vice President to me are the proof that this was going on as early as January 1999 (exhibits 61,62).

This statement (exhibit 192B) is not true. In fact, the exact opposite is true. The proof is here (exhibits 61,62, 143, 146). The "principal benefit" was not "income from tuition paid by the SMUSOM (SMU) students" to SJC. The principal benefit was income from tuition paid to SMU using SJC's Stafford loan program (exhibits 61,62,143,146).

This statement (exhibit 192C) is not true. The proof that the origin of SMU's tuition was SJC is here (exhibits 61,62).

Dr. Thornton's false statements gave rise to misrepresentations made in an official report by the State of California (exhibit 185).

Dr. Thornton (exhibit 189A,B) misled the State of California in the same way Dr. Thornton misled me (exhibits 54, 55, 61,62, 103-107, 183, paragraphs # 19,33,34,37,38).

In this article, written by Myrle Croasdale and published by the American Medical Association (AMA) on January 16, 2006, Dr. Thornton responds to the State of California's report. Dr. Thornton refers to other medical schools as "rogue schools" (exhibit 194A), derides the professionals sent by the State of California (exhibit 194B), and publicly complains about the cost of the evaluation "$65,000" (exhibit 194C). Dr. Thornton makes this statement (exhibit 194D) "We had no sense that there were problems", which is a false statement.

It is not unusual for Dr. Jerry Thornton to make a large number of false and

misleading statements (exhibits 55, 61, 62, 103-107, 183, 192, 194, paragraph #'s 19,33,34,37,38).

THE PURCHASE OF SMU BY EQUINOX CAPITAL AND DANIELS
AND KING MANAGEMENT DOING BUSINESS AS PRAIRIE CAPITAL

SMU received these FFLP student loan funds (exhibits 143, 146), when it was not eligible to receive these funds. SMU may have paid these HEA funds back to the United States (approximately $160,000)(exhibit 195A) through this lobbying firm, Kirkpatrick & Lockheart (exhibit 195B), now K&L Gates. Using Federal funds received under the HEA for lobbying purposes is prohibited under 20 U.S.C. § 1011m(c).

**(c) Lobbying and earmarks**

No Federal student aid funding under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.) [and 42 U.S.C. 2751 et seq.] may be used to hire a registered lobbyist or pay any person or entity for securing an earmark.

In 2007 Daniels and King Management (dba Prairie Capital) claims to have purchased SMU in what it describes as a "partnership" with Equinox Capital (exhibit 196C).
Equinox capital itself states " Prairie Capital partnered with Equinox Capital to acquire the three universities. Contact Steve King or Bryan Daniels for more information." (exhibit 196C).
St. Matthews University is listed under the heading "Prairie Capital Fund III" (exhibit 196B).

I believe the loan these defendants used to purchase SMU was a Federal loan, provided by the United States Small Business Administration (exhibit 12).
Using Federal funds received under the HEA for the purpose of making a Federal loan is prohibited under 20 U.S.C. § 1011m(a)(b)(3).

**§1011m. Certification regarding the use of certain Federal funds**

**(a) Prohibition**

No Federal funds received under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.) [and 42 U.S.C. 2751 et seq.] by an institution of higher education or other postsecondary educational institution may be used to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any Federal action described in subsection (b).

**(b) Applicability**

The prohibition in subsection (a) applies with respect to the following Federal actions:

　(1) The awarding of any Federal contract.

　(2) The making of any Federal grant.

　(3) The making of any Federal loan.

Rodger Courtney's resume boasts extensive lobbying experience, however Mr. Courtney's resume fails to mention any lobbying experience of this nature during SMU's years of lobbying (exhibit 195) that coincided with his years as SMU's "Special Council" (exhibit 286A).

## PLAINTIFF'S THEORY

SMU's current owners entered into an agreement with the Serslands. SMU's owners would give the Searslands a medical school (essentially a structure on the Island of Nevis called Medical University of the Americas (MUA)) in exchange for the correct SMU records. The Serslands gave them the records and the Searsland's moved to Nevis (exhibit 198). SMU's current owners eventually discovered that the records the Serslands gave them (exhibit 249, side A) were not correct either, leading me to believe that the records were truly destroyed in June of 2001 (exhibit 187 A,B).

## FACTUAL ALLEGATIONS

This is why my official transcript from 2002 (exhibits 133,134) is significantly different from the official transcript in 2010 (exhibit 249, side A).

## PLAINTIFFS THEORY
### WARNING GRAPHIC CONTENT

Before the Searsland's left for MUA on the island of Nevis in the Federation of Nevis, St. Kitts, they sealed this body in blue plastic so the smell would not alert authorities, mixed the body in with those in the gross anatomy room, secured the facility, abandoned it and left the country (exhibit 197). This may be why no one was told about the bodies for 3 years. This video (video exhibit #12, exhibit 197) and this article (exhibit 198) describes "donated furniture" as the means of discovery of the bodies but it is a fiction. This scheme of discovery was concocted by the Searslands and by Mr. Paz when Mr. Paz received notice from the bank that his property was about to be foreclosed because the Searslands had not made the payments in three years and they knew the bodies would soon be discovered and that one of those bodies would be noticeably different from the others.

This corpse lying on the floor, wrapped in blue plastic, (video exhibit #12, exhibit 197) should not be wrapped up. This body should be in the same stage of dissection as the other bodies on the tables. These bodies are in the same room that I shot the "Scorpion" video in (video exhibit #3, exhibit 68,69).

## FACTUAL ALLEGATIONS

In 1999, I met Mr. Sefarino Paz, aka. "Ceffe" Paz, and his name appears on these

SMU Florida Corporation document (exhibit 47C, 48C, 49D). Mr. Paz told me that SMU rented it's property from him.

SMU spied on it's students when I was there. Almost all students and faculty used SMU's free, complimentary email address/service on SMU's computer kiosk in the library. The only way to save an email was to print it out. This copy printed up in a different building, the administration building. An SMU employee would bring it out from a back room. You had to initial the email. A copy was then made. The student was given the copy and SMU kept the original. This is why my initials appear on exhibits 61G, and 62E. SMU was monitoring which emails you had copies of and which ones' you did not. Any one who used this same system to report what was going on at SMU may have been in grave danger. This individual in the blue plastic bag appears to be tall (approximately 6 feet in height) and slender. I believe this should be considered a homicide until proven otherwise. A reasonable effort to identify these remains should be made and the results compared against any State and/or Federal witnesses or complainants who stopped cooperating around the summer of 2005, as well as any students or faculty who went missing around the summer of 2005. This person (video exhibit #12, exhibit 197) may have been a student who was using this same system to report what was going on at SMU or a Professor or faculty member like Dr. Di Patre, who had not been paid in four months (exhibit 74,75).

In this interview with a reporter, Dr. Renae Sersland acknowledges her association with this event and her location at that time (exhibit 198B). Her explanations give some insight into her style of reasoning (exhibit 198B).

## PLAINTIFF'S THEORY

SMU's owners found out that the records the Serslands had given them were not correct and the Serslands left Nevis and returned to Belize City around 2009 (exhibit 291B) and several years later, back to Ambergris Caye (exhibit 291A,C), the location of SMU's original campus and the same location where they had abandoned the 6 bodies.

## FACTUAL ALLEGATIONS

In March, 2012, the US DOE completed an on-site evaluation of Medical University of the Americas (MUA) for eventual participation in the US Government's student lending program (exhibit 199). R3 education and Equinox Capital claim ownership of MUA here (exhibit 237). MUA is a Florida Corporation (exhibit 200).

In 2007, my Father told me that the US Department of Education and Sallie Mae were about to turn off the utilities to his and my Mother's home and begin the process of "taking the house". A couple of days later, my Mother called to say that my Father had a heart attack (exhibit 201, video exhibit #10). In this video, my Father is sitting on the bed he died on, in the room he died in (video exhibit # 11, exhibit 202). I shot this video to